### PELLET et al. v. MANUFACTURERS' & MERCHANTS' INS. CO. OF PITTSBURG, PA.

(Circuit Court of Appeals, Seventh Circuit. October 19, 1900.)

No. 663.

1. CONTRACT—CONSTRUCTION—BREACH.

Defendant, an insurance company, contracted with plaintiffs, who conducted a general insurance agency, constituting plaintiffs its general agents to have charge of all its business in certain states for a term of three years; plaintiffs to receive as compensation commissions on the business done. *Held*, that the contract was in effect one for the employment of plaintiffs as brokers, and, in the absence of express provision therefor, did not deprive defendant of the right to discontinue its business in all or any of the states named during the term, if in its judgment advisable, and that such discontinuance did not constitute a breach of the contract which would afford a basis for the recovery by plaintiffs of the prospective commissions they would have earned had the business been continued, as damages, whatever might be their right to recover for expenses incurred in reliance on the contract, or for loss of commissions on business already secured. Per Grosscup, Circuit Judge.

2. DAMAGES—BREACH OF CONTRACT—EVIDENCE.

Plaintiffs brought an action against defendant, an insurance company, to recover for breach of a contract by which plaintiffs were constituted general agents of defendant to have charge of its business in certain states for a term of three years, and to be paid by commissions on the business done. The breach alleged was the discontinuance by defendant of its business before the expiration of the term. The evidence introduced by plaintiffs to establish their damages consisted of statements showing the commissions earned under the contract prior to the alleged breach. It was also disclosed by their evidence that they represented other companies during the same time, that the expense of conducting their business was large, and that they secured the agency for another company as a substitute for defendant prior to and in anticipation of the alleged breach; but it did not appear what proportion of their expenses was properly chargeable to the business of defendant, nor what commissions were earned from the substituted company. *Held*, that such evidence was insufficient to furnish any measure of damages, conceding the breach of contract, and that prospective commissions estimated from past earnings could not be considered as an element of damages. Per Seaman, District Judge.

3. CONTRACT—ACTION FOR BREACH—ACCRUAL OF RIGHT OF ACTION.

An action to recover damages for breach of a contract of employment, brought while the employment still continues, before there has been any

actual breach, and before it is known whether any actual damages will result, is premature, and the plaintiff is not entitled to recover even nominal damages.    Per Seaman, District Judge.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The action in the Circuit Court was in assumpsit by the plaintiffs in error against the defendant in error, to recover damages for alleged breaches by the defendant in error of three certain agreements hereinafter referred to.

The plaintiffs in error, composing the firm of Pellet and Hunter, have been, ever since 1885 or 1886, and were at the times of the signing of the said agreements, and the bringing of the action below, engaged in a general fire insurance business, conducting and operating in such business a general agency throughout eight or nine states in the north west, and a local agency in Chicago. In the maintenance of said business they have, during said period, at their own expense, kept offices in the City of Chicago fully equipped for the transaction of their business, including clerks, stenographers, salaried special agents, and local agents, paid by percentage at various points throughout the field of their general agency, and other employés. In addition to the defendant in error, represented by plaintiffs in error under said agreements, the plaintiffs in error represented, as general agents, throughout the field of the north west five or six other companies, all of whom maintained their relations with the plaintiffs in error before, and after, the time of the alleged breaches of the said agreements by defendant in error.

The contract between the plaintiffs in error and the defendant in error, dated October 1st, 1897, is in the words and figures following:

"Agreement made this first day of October, A. D. 1897, by and between the Manufacturers' & Merchants' Insurance Company of Pittsburgh, Pa., and R. J. O. Hunter and Clarence S. Pellet, composing the firm of Pellet & Hunter, of Chicago, Illinois, Witnesseth:

"First. The said Manufacturers' and Merchants' Insurance Company does hereby appoint said Pellet & Hunter as General Agents in the territory hereinafter named, with full power and authority to appoint and remove agents and generally to conduct the business of said company under its instructions, within that territory.

"Second. The General Agency hereby created shall cover the entire states of Illinois, Michigan, Wisconsin, Missouri, Iowa, Nebraska, Ohio, Minnesota and Colorado, and all risks written by said Company on property within such states shall be written in or reported through the office of said Pellet & Hunter, at Chicago, Illinois.

"Third. The said Manufacturers' & Merchants' Insurance Company shall furnish whensoever requested, full and complete statements, copies of charter and all documents, necessary to enable the said General Agents to enter said company for business in any of the states above named; the time of filing such papers, however, being left at the discretion of the said Pellet & Hunter.

"Fourth. The said Pellet & Hunter are to give all necessary and proper supervision to the business of said Company in their territory, and in person or by competent representatives to make thorough inspection from time to time of the risk reported to them from the various agents;—and shall forward to said Manufacturers' & Merchants' Insurance Company of Pittsburg, Pa., with reasonable promptness, copies of all daily reports and endorsements received from agents and originals of their own business (the originals from agents to be kept in the office of Pellet & Hunter) and shall forward regularly—not later than the 27th day of each month—a detailed statement of the account of the business of such agency for the preceding month, and they shall be responsible for all premiums collected by agents appointed by them, and they shall make remittance to the said Company of the balance shown by such monthly statement to be due from them, not later than sixty days after the month for which such account is made up.

"Fifth. The said Pellet & Hunter shall retain during the existence of this contract a commission of thirty-three and one-third per cent. (33⅓%) on all net gross business reported through or by their office (by net gross business,

is meant premiums, less return premiums and all reductions by re-insurance) and in consideration of the sum so retained, they shall pay and bear all expense for supervision and inspection commissions to agents; all state, county and city taxes; all fees and charges of all state or municipal departments; adjustment expenses; and all other expenses and charges whatsoever, except only legal expenses in cases of litigation and the necessary blanks and forms for the proper carrying on of the business; and the balance, if any, of the said 33⅓% shall be retained by them as full compensation for their services as such General Agents. The said forms and blanks to be furnished at the expense of the said Manufacturers' & Merchants' Insurance Company—provided, however, that the said Pellet & Hunter shall be further entitled to a contingent commission of ten per cent (10%) on the net profits derived by the Company from their General Agency during the year ending September 30th, 1898, and each succeeding year, to be ascertained and paid after settlement of losses incurred during the year and after deducting the aforesaid 33⅓% and all other expenses paid for blanks, supplies and other matters pertaining to said General Agency, provided further, that if there shall be any unsettled losses by reason of dispute or litigation, such losses shall be treated as settled at the amount claimed by the assured, and so figured in determining the amount of contingent commission due said Pellet & Hunter and any difference in final settlement of said disputed or contested losses shall be added to or deducted from the losses of the succeeding year.

"Sixth. This contract shall continue for the term of three (3) years from the 30th day of September, A. D. 1897, provided however, that if at the expiration of the first year of its continuance, either party may desire to revoke or annul this contract, they shall have the right so to do, by giving to the other three months' written notice of their election so to do, and at the expiration of the date fixed in such notice, this contract shall cease and determine; such election to be made and such notice to be given, however, within ten (10) days after the expiration of the first year, or this contract shall again continue in full for a year, subject to a like revocation (in the manner as above provided) at the end of the second year."

A contract known as the "Five Companies Agreement," dated March 22nd, 1897, and the supplement thereto, executed March 19th, 1898, were substantially the same as the foregoing, except that the commission was fixed at thirty-three per centum instead of thirty-three and one-third per centum, and that they were to continue for three years from January 1st, 1897.

April 4th, 1899, the following agreement was entered into between the defendant in error and the Fidelity Insurance Company of Baltimore:

"That for and in consideration of the mutual covenants and agreements hereinafter expressed and set forth the said parties hereto have covenanted and agreed as follows, that is to say:

"First: Said Fidelity Company hereby reinsures and assumes at and from the hour of twelve o'clock noon (standard time) of Saturday, the first day of April, in the year eighteen and ninety-nine (1899), all outstanding policies and risks of said Manufacturers' Company, for insurance against loss or damage by fire or lightning on any property located in any part of United States of America or Canada, and the said Fidelity Company hereby assumes any and all liabilities under any and all outstanding policies or risks heretofore written by said Manufacturers' Company and for any and all policies or risks which may be written or undertaken by said Manufacturers' Company in pursuance of clause five of this contract.

"Second: In consideration of such reinsurance said Manufacturers' Company agrees to pay to said Fidelity Company in the manner and at the time hereinafter specified, the full unearned gross pro rata premium on all policies in force as of April 1st, 1899, less sixty (60) per cent thereof, which said deduction is to cover all commissions and expenses incurred by said Manufacturers' Company in connection with said policies or risks.

"Third: Within fifteen days after the date of this agreement or contract of re-insurance, said Manufacturers' Company agrees to make a cash payment of and to pay forty thousand dollars to the said Fidelity Company on account of said unearned gross pro rata premiums provided to be paid by said Manufacturers' Company to said Fidelity Company in the next preceding

clause of this agreement and the said Manufacturers' Company hereby agrees to pay the balance of said entire amount of such unearned gross pro rata premiums to the said Fidelity Company on the completion of the computation of the total amount thereof, provided said payment shall be made by said Manufacturers' Company not later than the first day of May, 1899.

"Fourth: And said Manufacturers' Company hereby agrees and undertakes to furnish to said Fidelity Company complete schedules or bordereaux of all outstanding policies of said Manufacturers' Company, on forms to be supplied by said Fidelity Company, which schedules or bordereaux shall be completed and furnished and delivered to said Fidelity Company on or before the first day of May, 1899, and it is hereby expressly and mutually understood and agreed between the parties hereto that said schedules or bordereaux shall be complete and accurate in all particulars, according to said form, and that said Fidelity Company shall not assume or be liable under any Policy or Policies omitted from or not set forth on said schedules or bordereaux nor shall said Fidelity Company be liable under any policy for or in any greater amount or for any longer period or term than may be set forth on said schedules or bordereaux.

"Fifth: It is agreed that the said Manufacturers' Company may and shall continue to issue its policies and do business in its own name until the first day of May, 1899, but all business so done or policies so written, shall be on account of, for the benefit of, and under the direction of the Fidelity Company or its duly authorized agent; and it is agreed that the Fidelity Company shall assume all expenses incurred by said Manufacturers' Company in connection therewith and that it shall also pay all local state and national taxes incident thereto, and that all risks and policies written in pursuance of this section of this agreement shall be and are hereby re-insured by said Fidelity Company as provided in Section 1 of this agreement.

"Sixth: The Manufacturers' Company hereby agrees to retire from business on the First day of May, 1899, and it agrees to wind up its business and affairs and to dissolve itself as an active going concern as soon thereafter as may be; and said Manufacturers' Company further agrees to transfer and deliver to said Fidelity Company all its good will, right, title and interest in and to its business, daily reports, endorsements, registers and books of record; but the office fixtures and furniture and other property of said Manufacturers' Company not herein specified shall remain the property of said Manufacturers' Company.

"Seventh: It is further agreed that the Manufacturers' Company shall pay all local, state and national taxes of any and all kind accrued or accruing, or which may be payable or which may apply to or on the business reinsured by this contract, and taken over as of the first day of April, 1899; and that the said Fidelity Company shall not be liable for or be held for the same in any way, manner or form, it being understood and agreed that this clause of this contract refers and applies only to taxes accrued or accruing as hereinbefore set forth, on or before the first day of April, 1899, and that said Fidelity Company shall be liable and held for and pay all such taxes accrued and accruing after the first day of April, 1899.

"Eighth: In case default shall be made by said Manufacturers' Company in making any of the payments provided for in this contract, or in performing any of the obligations herein assumed, this contract shall become null and void, and the said Fidelity Company shall be released from any and all liability hereunder and shall be entitled to rescind the same.

"Ninth: It is further expressly understood and agreed between the parties hereto, that this contract shall only be effective as between the parties hereto, and that no holder of any policy in the Manufacturers' Company shall be entitled to enforce this contract as against the Fidelity Company, it being understood that any and all holders of policies of the Manufacturers' Company shall prosecute according to the usual course of business against said Manufacturers' Company, any and all claims arising under said policies and the Fidelity Company hereby agrees to pay all such claims legally arising and duly proven, and further, in case of any contest arising in connection with, or suit being brought for or on any such claim, said Fidelity Company agrees to defend the same and pay all costs and expenses incident thereto.

"Tenth: It is further agreed that all reinsurance and contracts or policies of reinsurance which said Manufacturers' Company has heretofore effected with other insurance Companies, for the purpose of reducing its liabilities, shall be transferred to said Fidelity Company; and said Manufacturers' Company hereby agrees and undertakes to execute any and all proper instruments of transfer or assignment of the same; but in case any company so reinsuring objects to such transfer, then said Manufacturers' Company agrees and binds itself to cancel such reinsurance and to pay to said Fidelity Company the unearned premium thereof."

On the same day, April 4th, 1899, the defendant in error wrote to the plaintiffs in error as follows:

"This company has been purchased by the new Fidelity Ins. Co. of Baltimore, Md., Capital $500,000, Surplus $250,000, and policies will be guaranteed by same. Vice President Ammon and myself remain with the company without change.

"Mr. Barry, the President, is here and desires that the agents be advised to continue to write conservatively and give us lines on good dwellings and other preferred classes, a compliance with which, and push for profitable business will be considered as a personal favor by Mr. Ammon and myself."

The plaintiffs in error, on the 6th of April, 1899, replied as follows:

"We beg to acknowledge receipt of your favor of the 4th inst., advising us of the re-insurance of the Manufacturers' & Merchants' Insurance Company in the 'Fidelity Fire' of Baltimore, and as the effect of this and other acts of the company has been a virtual repudiation and abandonment on the Company's part of its contract with us as General Agents and destroys the value of said contract, we wish to notify you that we consider and treat said contract as having been terminated by your acts, so far as performance of it is concerned, and as continuing in force only for the purpose of enabling and entitling us to sue for such profits as we would have realized had we not been prevented by the Company's said acts from performance of the contract.

"We have no contract with the Fidelity Fire Insurance Co., and while they have acquired the business of the 'M. & M.' by re-insurance we cannot recognize that fact as carrying with it our contract with the 'M. & M.'

"As you intimate in your letter a desire on the part of the 'Fidelity Fire' to have 'M. & M.' Agents continue to issue that Company's Policies, we have advised agents of our action aforesaid as General Agents and requested them to report all business written after the receipt of our notice to them to the office of the Company at Pittsburgh.

"All transactions up to this date will be closed up at the earliest possible moment. As our Local Agency Department in Chicago is involved with our General Agency Contract, we shall consider that as likewise terminated as far as performance is concerned, but as continuing for the purposes of recovering lost profits, and will ask you to kindly advise us by special instructions as to your wishes concerning future endorsement cancellations, losses and such matters.

"We desire also to notify you that the foregoing acts and statements apply equally to the agreement of March the 22nd, 1897, and an amendment thereto of March the 19th, 1898, providing for the issuing of Joint or Underwriters of Pennsylvania Policies, and that so far as the Manufacturers' and Merchants' Insurance Company is concerned we consider that contract as likewise terminated by your acts aforesaid, so far as performance of it is concerned, but as continuing in force only for the purpose of recovery of lost profits.

"We regret the outcome of this matter, but the treatment which we received growing out of the sale and re-insurance of the Company, the lack of consideration shown us and the utter ignoring of our rights or interests under our contract by the Company, leave us no alternative but the one above indicated."

To this the defendant in error, April 8th, 1899, replied as follows:

"It seems you do not understand the situation, or did not receive letter of the 4th inst. stating 'This Co. has been purchased by the new Fidelity Ins. Co. of Baltimore, Md., Capital $500,000, Surplus $250,000, and Policies will be guaranteed by same. Vice Prest. Ammon and myself remain with the Company without change. Mr. Barry, the President, is here, and desires that the agents be advised to continue to write conservatively and give us lines on good

dwellings and other preferred classes, a compliance with which, and push for profitable business will be considered as a personal favor by Mr. Ammon and myself.'

"You were fully advised of all that is known in the matter; the Co. is continuing, has never advised discontinuance. Haven't the stockholders a right to dispose of their stock, and purchasers a right to it and I see no valid reason for saying contract is violated. I was at meeting of Co.'s interested in Underwriters, and there has been nothing done as yet to disturb existing arrangements. Of course, if outsiders can stampede the business it is their interest to do so. The intent of purchaser of business is to keep on in old way, so personally I think there is a mistake."

Treating this course of affairs as a renunciation and abandonment of the agreements by the defendant in error, the plaintiffs in error, April 18th, 1899, brought the action below.

After introducing the foregoing, with other correspondence not necessary to set out, plaintiffs in error, to show damages, submitted evidence tending to show that the net amounts coming to the plaintiffs in error, under the commissions provided for in the agreements, were, for the preceding years, as follows:

| | |
|---|---|
| 1894 | $9850.39 |
| 1895 | 9130.70 |
| 1896 | 8034.30 |
| 1897 | 6006.60 |
| 1898 | 5234.67 |
| And for three months preceding the bringing of the suit a loss of | 108.79 |

Like evidence was submitted showing that under the Five Companies Contract the plaintiffs in error received for 1897, $826.40, and for three months in 1899 sustained a loss of $28.

The evidence disclosed that in arriving at these amounts there was charged against commissions provided for in the agreements the following: Department taxes, fees and certificates; state taxes; advertising statements; city taxes; fire department taxes; board and compact expenses; patrol taxes; city licenses; commissions to agents, and other deductions by agents; and adjustment expenses.

It was shown that the clerical expenses of conducting the business of the plaintiffs in error ran from thirteen thousand to sixteen thousand dollars a year; that the office rent was from four thousand seven hundred to four thousand seven hundred and fifty dollars a year; and that there were other expenses the figures of which were not given. The total expense was said by one of the plaintiffs in error to have been probably thirty thousand dollars.

These figures, relating to clerical expenses, office rent, etc., did not enter into the calculation of damages upon the theory of the plaintiffs in error, and were rejected by them in the court below, and in this court, as having no pertinency to the question of damages.

No evidence other than has been given, relating to damages, was submitted.

At the conclusion of the evidence submitted by the plaintiffs in error the jury were instructed by the court to return a verdict for the defendant in error.

William H. Barnum, for plaintiff in error.

Frank H. Scott, for defendant in error.

Before WOODS and GROSSCUP, Circuit Judges, and SEAMAN, District Judge.

After the foregoing statement of facts, GROSSCUP, Circuit Judge, delivered the opinion of the court, as follows:

The contract of October 1st, 1897, in substance, provided for the establishment of a general agency for the promotion of the business of the defendant in error within the territory named; appointing to

such agency the plaintiffs in error. On behalf of the general agents it was contracted that within the territory named they would supervise the business of the company; inspect the risks reported by the local agents; forward copies of all daily reports; be responsible for all premiums collected by local agents appointed by themselves; remit to the company the balances shown to be due to the company upon the monthly statements; bear all expenses of supervision and inspection; all commissions to agents; all state, county, and city taxes, fees and charges; and all other expenses and charges, except such as relate to litigation.

Upon the part of the Company it is contracted that out of the business thus done by these general agents they shall retain, as compensation for their services, during the period of the contract, a commission of thirty-three and one-third per centum on the net gross business reported through their office, and a contingent commission of ten per centum of the net profits derived by the company from this general agency.

The life of the contract is fixed at three years from the 30th of September, 1897, providing however, for an earlier discontinuance upon the giving of a designated notice.

The Five Companies' Contract of March 22nd, 1897, is, so far as the obligations between the companies and the agents are concerned, almost identical with the preceding contract, except that the commission is thirty-three per centum instead of thirty-three and one-third per centum, and that its life is fixed at three years from the 1st of January, 1897, subject to termination upon designated notice.

The plaintiffs in error conducted a general insurance agency, and represented, in addition to the defendant in error, five or six other companies. It is not claimed that, upon the strength of the making and continuance of the contracts sued upon, they enlarged their office expenses, increased their clerical force or other equipment, or in any way injuriously assumed liabilities, or made preparations, that would not otherwise have existed. Nor is it claimed, as a matter of damages, that they were in possession of, or that there afterwards came to them applications for insurance, which, in the natural order of business, the defendant in error would have accepted, had there been no discontinuance of its business. The sole injury claimed is the loss of commissions upon business, not yet in hand, but merely in expectancy, should the company, throughout the remaining period of the contract, accept, as in the past, such applications as the general agency would bring to it.

Unless, therefore, the contracts, either expressly or by implication, bound the defendant in error, throughout the period of the contracts, to a continued acceptance of such business as the plaintiffs in error might bring, irrespective of its own judgment upon the policy of diminishing or ceasing altogether such business, there exists no promise upon which the action can be predicated. The existence, in substance, of such a promise, within either the language or the implications of the agreements, lies at the basis of the right of the plaintiffs in error to complain. Can we find in the agreements, or reasonably read into them, any such promise?

A negative answer to this inquiry does not require us to hold that the defendant in error could, without suable injury to the plaintiffs in error, dismiss, before the termination of the contract, and without cause, the latter as their general agents, while continuing, through other agents, to accept business in the territory named. There may reasonably be an implication in the agreements that, throughout the period named, the plaintiffs in error shall continue as general agents, if the defendant in error continues within that territory to accept business. But an implied promise of that kind is substantially different from the supposed promise that lies at the basis of this action.

Nor is it necessary for us to hold, in answering negatively the inquiry stated, that for outlays made, and losses of commission on account of applications already obtained, in reliance upon a continuation of the relation to the end of the time stipulated, the plaintiffs in error would have no right to recover. An action for such injuries is not dependent upon the supposed promise under discussion.

We, recur, then, to the inquiry, Did the agreements bind the defendant in error, irrespective of its own judgment subsequently formed respecting the character, volume, or continuance of its business, to accept, throughout the period named, all such business as the plaintiffs in error might bring? Did the company abdicate to the general agents, except at the cost of a sum equal to one-third of its gross income from the territory named, the prerogative of determining what should be the scope of the company's business within the given territory?

The prerogative is an important one. It might well happen that, out of some consideration relating to its own policy, the company might choose to materially abridge its business within, or withdraw altogether from, the territory named. The laws of a state may become burdensome; the character of risk in a given district may change; a wise adjustment of its affairs may require a change of field of operations, or an entire liquidation of its business. Was it contemplated, in the execution of these agreements, that the judgment of the company upon these questions should be surrendered to the interests of the agents; at least that it could not act upon such judgment without continuing to compensate the agents, as if no such action had been taken? We think the agreements will bear no such interpretation.

The plaintiffs in error were, in substance, insurance brokers to the company. Their place was that of the middle-man; their office to procure for the company such risks as it was in the habit of accepting; their measure of compensation a percentage of the business done. The company bound itself to this measure of percentage, but did not bind itself that the volume of business done should be unchanged. There is nothing in the contract that shows that this vital power—the power of determining for itself the scope of its own business—is transferred from the discretion of the responsible owner, to the discretion of the brokers. An interpretation so far reaching can only rest on unmistakable expressions or implications to that end.

The language of the agreements does not justify such an interpretation. It is true that it is provided that the contract shall continue for the term of three years, subject to annulment by either party upon giving to the other three months' written notice; but, at most, this would sustain an action only for outlays made in reliance upon a continuance of the contract, or for commissions upon specific business already initiated; or possibly for commissions upon the business done within the territory through other agents than the plaintiffs in error after a causeless dismissal of the plaintiffs in error. The clause in question binds the company to a continuance of the relationship of principal and broker, and possibly to a recognition of the plaintiffs in error as the company's sole brokers, but there is no clause that wrests from the company the sole power to determine what shall be the extent of its business through these brokers in the given territory. The contract is searched in vain for the expression of any such understanding, or an implication to that effect.

A clearer conception of the cogency of this conclusion may be obtained by a look into similar relations in the other fields where brokers are employed. A broker employed exclusively to sell upon commission real estate, grain or live stock, through a given period, may insist that, if within that period sales are made through another agency, his commissions shall be paid notwithstanding. His right, in that respect, is founded upon the implied promise that he shall receive commissions upon all sales made. But if the owner of the real estate, grain or live stock chooses, in the exercise of his judgment, to retain his property, and make no sales, the broker may not recover according to the measure of his mere expectancy; for there is no implied contract that the owner shall be deprived of the right to determine when he shall sell, or how much he shall sell, or whether he shall sell at all.

We find nothing in the agreements under consideration that puts the defendant in error in any different relation to its brokers. It is bound, possibly, to them, to transact through them whatever business it may do within the territory named, and to pay them therefor the stipulated commission upon the business done; if so, it is bound, likewise, to observe these obligations through the period provided. But it is not bound, any more than is the owner of the real estate in the illustration given, to make good to the brokers what may have been their mere expectations of the business to be done. It has not made the agents its master in the control of matters that may go to the very heart of its affairs.

We are not aided in the case under consideration by Morris v. Taliaferro, 75 Ill. App. 182, and the line of cases of which it is an illustration, in which it is held that one employed by another for a given period at a given salary, and discharged before the period expires, has a right of action for the stipulated salary, or so much of it, at least, as he was not able to earn in other employment. Such cases proceed upon the existence of an express promise to pay a given sum of money upon the performance of a given service.

Nor are we aided by Furnace Co. v. Magill, 108 Ill. 656, a case in which the plaintiff agreed that he would carry during the season of

1873 from Escanaba to St. Joseph, in Michigan, for two dollars per ton seven thousand tons of ore, and from Marquette to St. Joseph for three dollars and a quarter per ton three thousand tons of 'ore "freight to be due and payable upon delivery of each cargo at St. Joseph." Upon the defendants' failure to furnish the ore as cargoes, though the plaintiff was ready and willing to carry them, an action for damages was brought. The court found that the transaction embodied a promise upon the part of the defendants to pay freight during that season between the points named on ten thousand tons of ore, and that the defendants' failure to pay such sum gave the plaintiff the basis for a cause of action. As in the line of cases just before referred to, there lies at the basis of this case the existence of a promise accurately measuring the extent of the defaulting party's obligation. It is the absence of just this element —a promise commensurate with the theory upon which the plaintiffs in error compute their damages—that makes the case under consideration one that can not be maintained.

In coming to this conclusion we have considered carefully Lewis v. Insurance Co., 61 Mo. 534, and to the extent that that case involves the question here discussed are constrained to disapprove of it. We prefer to follow In re English & Scottish Marine Ins. Co., 5 Ch. App. 737, on appeal from the Master of Rolls, in which an insurance company, having a contract with its agent similar to the one under discussion, voluntarily ceased to do business before the contract expired. A claim for the commissions having been included in an action for damages the court disallowed it, speaking through James, L. J., as follows:

"I am of the opinion that this was a contract which did not give the servant the right to determine what the extent of the business was to be. He could not call upon the directors to issue new policies or to take new risks if they were not minded to do it. He could not say, 'Such a person has brought in a policy of us and you must accept it,' because if he had a right to say, 'You must carry on business.' he would also have a right to say, 'You must carry on business in the usual and proper manner,' and that would be giving the servant the right of controlling the master in the manner in which he chose to carry on the business. Now I am quite satisfied that the meaning of this contract was nothing of the kind. It was never intended to give the servant the right of dictating as to the extent of the business, be it more or less or nothing, but he simply took the chances of the company finding it a profitable business and carrying it on."

Our conclusion respecting this question, going as it does to the whole claim made by the plaintiffs in error in the Circuit Court, dispenses with the need of disposing of the other questions presented. We hold that, upon the proofs submitted in the Circuit Court, no case for the plaintiffs in error was made out, and that, therefore, there was no error in the court's instruction for a verdict for the defendant in error.

The judgment of the Circuit Court is affirmed.

SEAMAN, District Judge. I concur in the decision to affirm the judgment rendered below in favor of the defendant, but am of opinion that other substantial grounds are presented on which it may rest,

without determining the close question whether breach of the contract in suit can be predicated alone upon the fact of the transfer of the entire business of the defendant company to the Fidelity Fire Insurance Company, and the notice thereupon given to the plaintiffs. The action was brought and all the testimony was introduced on behalf of the plaintiffs upon the theory that they were entitled to recover for the alleged breach, prima facie at least, a rate of compensation for their assumed earnings under the contract, during the remaining portions of its term, measured exclusively by the showing of income derived thereunder in the preceding years. Such view is clearly untenable under the authorities, but counsel for the plaintiffs insists that other evidence was produced tending to show the probability of a like amount of business in the future, on which they were entitled to go to the jury. It is a sufficient answer to this contention that no substantial evidence appears in the record to furnish even semblance of support for it. On the other hand, the case on the part of the plaintiffs disclosed at least two obstacles to any prima facie value of the showing thus made for measuring the damages, even on the assumption that the proofs were otherwise sufficient, namely: (1) Evidence of general expenses of the plaintiffs in conducting their agencies, aggregating about $30,000 per annum, no part of which was included in their showing of earnings under the contract in suit, nor was any proof furnished to show the pro rata share which was applicable to the business transacted thereunder; (2) evidence that another insurance company was secured by them in the place of the defendant, before and in anticipation of the alleged breach, without proof either tending to show that the substituted company was not of equal value to the agency, or loss in any respect through the change. However the general rule may be as to the onus of proof for mitigating the damages, it seems clear that the plaintiffs must make the full disclosure when the fact of mitigation appears on their own side of the case, and the proof of its extent is wholly within their knowledge. Unexplained, either of these conceded facts is destructive of any presumptive value in their testimony of the amount of commissions derived under the contract prior to the breach.

Failing evidence to authorize a verdict for substantial damages, the question would remain to be considered whether the plaintiffs were nevertheless entitled to a judgment for nominal damages,—a question which arises only because the action came to the court below through removal from the state court, and thus may affect the allowance of costs. Section 968, Rev. St. This technical rule is not applicable unless the evidence on the part of the plaintiffs establishes a breach of the contract, and if the issue depended alone upon a construction of the contract, as held in the prevailing opinion, any doubt upon that point might well be resolved in favor of the judgment. But I am satisfied that other grounds of objection to the right of action are presented, which are at least equally sufficient, namely: (1) That suit was commenced while performance under the contract was continuing on the part of the plaintiffs, and under which they accepted benefits thereafter; (2) that the plaintiffs practically aban-

doned the contract by accepting inconsistent obligations before the alleged act of abandonment on the part of the defendant, and when performance by the latter was neither refused nor made impossible; and, on the case as a whole, (3) that the undisputed circumstances show the action to be prematurely brought, as well as without sub-stantial merit. Therefore the judgment is rightly affirmed.

WOODS, Circuit Judge, concurs in the result.