## WOLFE v. INTERNATIONAL FIRE INS. CO.

### (District Court, D. Maryland. May 31, 1912.)

1. INSURANCE (§ 79*)—AGENTS—EMPLOYMENT—RESCISSION BY MUTUAL CONSENT.

Where plaintiff, who had entered into a contract to act as a general agent for defendant insurance company for a term of 10 years, through his attorneys notified defendant that, owing to its alleged breach of the contract, he had concluded to rescind the same and demanded the return of the consideration he had paid therefor, which notice was accepted by defendant, a rescission by mutual consent was effected, notwithstanding the fact that plaintiff at the same time demanded damages which defendant refused to pay, and plaintiff cannot maintain an action in covenant on the contract to recover damages for its breach.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 104; Dec. Dig. § 79.*]

2. INSURANCE (§ 85*)—CONTRACTS OF AGENCY—CONSTRUCTION—BREACH.

A contract by which defendant, a fire insurance company, employed plaintiff as its general agent in two states for a term of 10 years with the right to appoint all agents under him, his compensation to be a percentage of all premiums received from the business done in such states, did not deprive defendant of the right to select such business as in the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

judgment of its directors was for its best interest, and give plaintiff a vested right to insist that it should do all kinds of business that was done by other reputable companies, and an order of the directors that plaintiff should cease writing policies on certain kinds of risks which had proved unprofitable did not constitute a breach of the contract which entitled plaintiff to damages.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 115; Dec. Dig. § 85.*]

At Law. Action by Francis E. S. Wolfe against the International Fire Insurance Company. On demurrer to replication. Demurrer sustained.

Slingluff & Slingluff, of Baltimore, Md., for plaintiff.
Ritchie & Janney, of Baltimore, Md., for defendant.

ROSE, District Judge. The plaintiff sues the defendant for an alleged breach of a contract by which the plaintiff became general agent for the defendant. The plaintiff will be called the "agent," the defendant the "company."

The declaration sets forth the agreement in full. By it the agent became general agent of the company for the states of Maryland and Pennsylvania. In that territory he was to appoint all agents or subagents. His compensation was to be 32½ per cent. on all premiums, less return premiums and reinsurances collected for all business written within the territory for account of the company. Many of the expenses of the agency were to be paid by the agent, others by the company. The agent was to give bond for $20,000.

The contract provided:

"It is understood and agreed that this contract shall continue in force after approval of said bond for ten years from the date hereof. * * * It is further agreed that said company reserves the right to cancel this contract if at any time after the first year, or any year thereafter, the losses and expenses exceed the receipts for two consecutive years."

The agent agreed to make certain daily and monthly reports and to remit at the times and in the manner prescribed in the agreement. This agreement was dated May 31, 1910. The agent gave the bond and entered on the discharge of his duties under the agreement.

The declaration alleges that on the 4th of August, 1911, the company wrote him that the board of directors, after thoroughly analyzing his account and business sent to the company, found that the same had produced a very heavy fire loss, and for that reason the board had determined to ask him not to send any new business or renewals from the date of the receipt of the letter, excepting risks of the preferred class. He was directed to decline all special hazards and outside unprotected risks. The letter said:

"You are familiar with the excess losses which your territory has produced, and as a matter for our own protection we are forced to demand a more limited classification. You are also aware that the company cannot be reasonably expected to maintain an agency plant at a state that is producing such excessive losses. We desire as far as within our power to minimize the losses and ask your hearty co-operation and trust you will agree with us and work to attain the end desired."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The declaration says that the company thereafter declined to accept policies of insurance, whether the class known as new business or renewal, written by the agent and ·forwarded to the company, and from the time of such letter the company wrongfully refused to permit the agent to perform said contract. It alleges the readiness and willingness of the agent to have performed it. It says that the action of the company in refusing to accept from the agent the insurance policies, other than risks of the preferred class, amounted to a breach of the contract to the damage of the agent.

The company for a first plea said that the contract was by mutual agreement rescinded, and set forth in the plea certain correspondence which had passed between the agent and the company. From this correspondence it appears that the agent, through his attorneys, on the 10th of August, declined to admit the right of the company to limit in the manner attempted the business he might do. He notified the company that until further informed he should continue to write business as theretofore. On the 23d of August he again wrote through his attorneys. These gentlemen said that they had advised the agent that the demand to restrict his future business to the preferred class and the company's subsequent refusal to retain insurance written by the agent for risks other than the preferred class was practically a nullification of his contract of agency and entitled him to rescind the contract and to demand the return of the consideration therefor as well as compensation for the losses he has sustained. They add:

"By reason of this breach of contract by your company in manner indicated, Mr. Wolfe has concluded to rescind the same and we hereby notify you of his rescission thereof and demand on his behalf a return of the consideration therefor as well as full compensation for his expenditures and losses."

They further say that they had instructed the agent that, owing to the breach of contract by the company, he was not to make his monthly remittances as agent until the matter was adjusted. They added that, in order to minimize the company's loss as much as possible, he would, until further notice, without waiving any of his rights, continue to forward such business as may be forthcoming until the company could make such other arrangements as it saw fit to care for the same.

On the 26th of August the company replied through its attorneys. In that letter they said, "We accept your notice of such rescission." The agent was notified not to write any further business. They said that, if the agent did not make his monthly remittances as agent in accordance with the terms of the contract now rescinded by him, suit would be brought upon his bond.

In another letter addressed to the agent and written on the same day as the last, viz., August 26, 1911, he was told that the company accepted notice of his rescission of the contract "which, in accordance with your election, we now treat as terminated."·

The company's second plea alleged full performance by it and breach by the agent.

On the second plea the agent joined issue, and to the first plea he replied that from the correspondence contained in the company's first

plea, and from the additional letters reproduced in the agent's replication, it did not appear that there was any joint concurrence by the parties to the said contract under which the same was by mutual agreement rescinded. These additional letters consist of a letter from the agent's attorneys to the company under date of September 8, 1911, in which they demanded $25,000 damages and loss sustained by the agent by reason of breach by the company of its contract with him. $5,000 of this is the amount required of the agent for the purchase of stock in the company in order to obtain the general agency. $20,000 was the estimated loss of profits on business written and to be written during the life of the contract if it had not been broken. In reply to this letter, the company's attorneys, under date of September 11, 1911, explained that:

"The losses of the company had become so great and were increasing so rapidly that the officers of the company called together the directors from the different parts of the state * * * to consider what could be done to reduce these losses and protect the interests of the company, both of the policy holders and the stockholders."

The directors—

"decided that the interests of the company imperatively demanded that steps be taken at once to curtail the losses, and with this end in view, and this only, they decided that in those states where the business had been unprofitable and where the losses had been so great, they would, at least for the time being, instruct their agents to eliminate the unprofitable business and take only such risks as the company might safely carry."

They stated that the agent—

"seemed to take the view that this was an assault upon his contract, and through you, as we understand the communication, he threw up the contract, and the company, through us, accepted the resignation and has since then been proceeding on the basis of his being no longer a general agent of this company."

In reply under date of September 19, 1911, the attorneys for the agent write, among other things, that:

"The business he handed into your company was such business as was done by all insurance companies in the ordinary course of insurance business, and that when you cut him down and limited him to the character of insurance which you require him to take, his business was practically gone, and that he would not realize enough from it to pay his office rent, much less the many other expenses of the same. From this viewpoint we have advised Mr. Wolfe that the action on the part of your company was a rescission of the contract, and he accepted the same as a rescission and a violation of the terms of the contract which would entitle him to substantial damages for such violation." "If we are correct in this view, Mr. Wolfe will be entitled to repayment of the $5,000 consideration and also to such damages as he may have sustained, measured by the profits which he might have made during the continuance of the agreement."

On September 27th the attorneys for the company answered. They said, among other things:

"If we understand your position, it is that Mr. Wolfe is entitled to a repayment of the consideration which he paid for stock in the" company; "but you do not say whether he still owns the stock, nor do you offer to return it to the company. We would like, therefore, to know definitely whether Mr. Wolfe still owns this stock, or whether he has disposed of it, and what he

considers the stock worth. We do not understand that, in any event, he would be entitled to receive back the consideration, even if he should return, or offer to return, the stock. It was a reasonable requirement on the part of the company, in appointing its general agents, that they should have a substantial interest in the company by owning stock, and Mr. Wolfe certainly could not claim that he could throw up his agency because of a real or fancied grievance, and then cancel his stockholding and recover back the money he had paid for it."

On October 7th the agent's attorneys answered that they had taken it for granted that the proposition made by them that the $5,000 should be returned to the agent included a return by him of the stock. This letter stated that the suit would be brought in a few days.

[1] The company demurred to this replication. It says that at the time suit was brought the contract had been rescinded by mutual consent. The agreement had so far ceased to exist that no action could be maintained upon it. The agent denies that what passed between the parties amounted to a rescission. He does not question that he in so many words told the company that he had elected to rescind the contract and the company expressly said that it accepted such rescission. He does claim, however, that all that in fact happened was that he offered to rescind upon terms, that the company could not accept the offer otherwise than upon such terms, and that it never did assent to the latter. If so, the rescission never became effective. The contract still remained in force. The correspondence does not suggest that the agent thought that, in telling the company that he had elected to rescind, he supposed he was making it an offer. Quite clearly he conceived himself to be exercising a legal right which, under the circumstances as he saw them, was absolute. Having so elected, he made demand upon the company for those things to which in consequence of his choice he felt he had become entitled. The company in effect replied: "We assent to your rescission of the contract. We do not think that your view of what follows from such action is in all respects correct." If he had chosen, the agent might thereupon have safely acted upon the assumption that the contract was at an end. The company would not have been heard to say, "We did not assent to your rescission of the contract because we expressed our nonconcurrence in your understanding of the legal consequences which it entailed."

It is true that the words "rescind" and "annul" are often loosely used.

Sometimes the party claims the right to rescind or annul a contract when he means nothing more than to say that he considers himself released from any further obligation of performance on his part, reserving to himself, however, the right to recover damages for the breaches committed by the other party. United States v. O'Brien, 220 U. S. 327, 31 Sup. Ct. 406, 55 L. Ed. 481.

It will not always be either fair or reasonable to deduce serious legal consequences from the mere employment of such words. The circumstances under which they were used and the interpretation which the party using them put upon them at the time, as shown by the connection in which he used them, should be taken into account. In

what sense were they used in the correspondence between the parties? At the time the correspondence began, the agent thought that the company had broken its contract. If that were so, he had a right, if he would, to treat the contract as still alive, and to sue for the damages he had suffered by its breach. He was not required to do so. He might, if he preferred, rescind it. If he did the latter, he could demand back the consideration he had paid, repayment of money laid out by him, and compensation upon a quantum meruit for the services he had rendered. If he elected to treat the contract as in force by suing for damages for its breach, he could not ask for the return of the consideration he had paid. The measure of damages for the breach of a contract is the amount which would put the injured party in the same position as he would have been had the contract been performed. He who recovers such damages is in theory of law placed in the same situation he would have been had no breach occurred. To give him back, in addition, the consideration he had paid to induce the other party to enter into the contract, would be to give him all the benefit of the contract while relieving him from all its burdens.

In the same sentence in which the agent's attorneys notified the company that he had "concluded to rescind" the contract, they demanded "on his behalf a return of the consideration therefor as well as full compensation for his expenditures and losses." The return of the consideration was something to which he was in no wise entitled if the contract was to continue in force, even to the limited extent that damages for its breach could be recovered. At no stage of the correspondence did he abandon his claim for the return of the original consideration. It is true in his later letters he asked not only to be paid back the consideration for the contract, but to be given damages for its breach. His insistence that he was entitled to get back the consideration proves that he was still asserting that the contract had been ended.

It must be borne in mind that this correspondence was conducted on his behalf by his attorneys. It was not a case in which a layman used technical words without comprehending their legal import.

There is no longer any doubt in Maryland that a contract under seal may be rescinded by mutual assent, although that assent be by parol. Herzog v. Sawyer, 61 Md. 344.

This action is in covenant. If the contract sued on has been by mutual consent rescinded, as from the correspondence it appears that it has been, the suit cannot be maintained. It follows that for this reason the defendant's demurrer should be sustained.

[2] The demurrer mounts up to the first fault in pleading. In this case it raises an issue which cuts even deeper than the one already considered. Was the refusal of the company to write any more risks in Maryland and Pennsylvania except those of the preferred class a breach of the contract sued on? If it was not, the agent has no cause of action against it upon such contract.

From the correspondence made a part of the pleadings, it appears

that the agent claims that he was induced to invest $5,000 in the stock of the company and to enter into the contract sued on by representations as to the character and extent of the business the company proposed to do in Maryland and Pennsylvania. What rights, if any, such representations, if made, would give him against the company, need not be here considered. Nor in this case can the court properly inquire whether the company's acquiescence in his express desire to rescind the contract does not give him a right to demand that he shall be restored to the position in which he was before the contract was made, and this irrespective of whether the company had or had not broken it.

In the case at bar the agent seeks damages for breach of the contract, and he seeks nothing else. · He says that by the contract the company made him its general agent for Maryland and Pennsylvania. No limitations were put by that agreement upon his powers. He contends that the company thereby bound itself to permit him to transact all kinds of business which a well-conducted fire insurance company operating in the states named ordinarily and habitually does. In particular he claims that the company bargained that he might solicit and write policies upon all that great mass of property which does not constitute what is technically known as a "preferred risk." The contract by its terms was to last for 10 years, unless, in the event that for two consecutive years the losses and expenses had exceeded the receipts, the company elected to cancel the contract. He says that it is upon business other than that of the preferred class that the substantial profits of a general agent are earned. When the company told him that he must not write policies on any property not of that class, it made the agency valueless to him. When the company, without his consent and against his protest, put him under such a prohibition, he contends it broke the contract. He argues that the express provision for its termination on certain contingencies which could not transpire until at least two years had elapsed from the making of the contract, shows that the company could not end the contract before the two years were up, nor afterwards except under the conditions provided for in the contract. There can be no question that the parties intended that the contract should last for ten years probably—for two years certainly.

But to what did the contract bind them? The company says that its agreement was that the agent was to be its general agent through whom it must for a period of ten years do all the business it was able to do and saw fit to do in the states of Maryland and Pennsylvania. During that time it could have no other agent than the plaintiff and his employés in those states, or either of them; but it reserved to itself the right to determine from time to time the kind, character, and extent of the business, if any, it would do in that territory. The agent says such a construction would be unreasonable because it would make the contract worthless to him. Would it? It was not a bargain which would necessarily be unattractive to a general agent. An experienced and capable insurance man is not likely to want to be general agent

for a fire insurance company unless he thinks it is likely to be so managed and conducted as to gain and hold the confidence of the public. If he thinks otherwise, he will not readily put $5,000 of his money into its stock. The company will not continue to stand well with the community unless its losses are kept within a reasonable percentage of its receipts. An agent will not doubt that, so long as the company can make money by doing business, it will want to do all the business it can get to do. He cannot afford to become its agent at all unless he supposes that it will prove successful and successful in his territory. If it does succeed there, it will be as eager as he to push the business it must do through him. For ten years he will share whatever measure of prosperity it enjoys as a consequence of the business originating in his territory. During that time it must give him 32½ per cent. of all the premiums it collects from business there done.

Put in another way: It is worth while to have the exclusive right for ten years to represent in two populous and wealthy states a fire insurance company doing a profitable business in them. It is worth nothing, and in the long run less than nothing, to represent a company which is not successful. From this point of view there will be nothing strange in an agent making an agreement which secured him nothing more than the right to do in those states for the company whatever business it from time to time saw fit to do in them. The agent, however, puts a different construction upon the contract sued on. He says that it binds the company for ten years, unless sooner terminated according to its terms, to insure all kinds of property which other well-conducted fire insurance companies are in the habit of insuring. He says the company must continue to do so even when in the judgment of its officers and directors such a course will be contrary to its best interests and to those of its stockholders and policy holders. He claims that by the contract he has obtained a vested right during its life to write policies upon all kinds of property not of an extrahazardous nature, and to get his commissions therefor. He relies on Stirling v. Waitland, 5 Best & Smith, 840; Life Association of America v. Ferrill, 60 Ga. 414; Macgregor v. Union Life, 121 Fed. 496, 57 C. C. A. 613 (C. C. A. 8th Circuit); Newcomb v. Imperial Ins. Co. (C. C.) 51 Fed. 725; Stowell v. Mfgrs., 61 App. Div. 58, 70 N. Y. Supp. 80; Seipel v. Inter. Life Ins., 84 Pa. 47.

It will serve no good purpose to review these cases in detail. Some of them can be readily distinguished from that at bar; some of them cannot. Other cases of greater authority take the opposite view. The interests of policy holders and stockholders require that an insurance company shall reserve to its officers and directors the right to determine from time to time, as conditions change, what risks the company should assume. The presumption at least is that it will not surrender this power for long periods of years to one who is neither an officer nor a director, to one who may never have been a stockholder, or, if he has ever been, may at any time cease to be. Such a person may be so situated that his immediate income may be of more moment to him than either the success of the company or his own permanent

prosperity as its agent. Such a bargain would seem to be unwise. For the purposes of this case it is not necessary to say or suggest that it is so far contrary to public policy that it would be unenforceable even when there could be no question that it had been made. All that need be said is obvious enough. He who claims that such an agreement has been made must be able to point to some language which is susceptible of no other reasonable interpretation. It will not be lightly presumed that the directors of an insurance company will so hamper their liberty of action. This is the view taken in Pellett v. Manufacturers' & Merchants' Ins. Co., 104 Fed. 502, 43 C. C. A. 669 (C. C. A. 7th Circuit) ; Kansas Union Life Ins. Co. v. Burman, 141 Fed. 849, 73 C. C. A. 69 (C. C. A. 8th Circuit) ; Moore v. Security Trust & Life Ins. Co., 168 Fed. 496, 93 C. C. A. 652 (C. C. A. 8th Circuit) ; In re English & Scotch Marine Ins. Co., Law Reports 5 Chancery Appeals, 739. It may be now taken as the settled doctrine of the higher federal courts. It should govern this case.

The plaintiff's narr. discloses no cause of action. Defendant's demurrer must be sustained.