## A. R. SCHRIMPLIN, Appellee, v. THE FARMER'S LIFE ASSOCIATION, Appellant.

**Insurance: AGENT'S CONTRACT: CONSTRUCTION.** The contract of a
1 life insurance association to pay a soliciting agent a stated
yearly commission on all insurance obtained by him so long as
the same should remain in force is not unreasonable and void
because operating "to tie up" the funds of the association or to
control future governing boards and officers.

**Assumption of Business of Another Association: AGENT'S COMMIS-**
2 **SION: ESTOPPEL.** Where an insurance association assumes the
policies of another association with knowledge of an agent's
contract creating a stated charge thereon in his favor to be
paid from a special fund, agrees to pay the same and proceeds
to collect the assessments and renewals upon which such
charges are fixed, it is estopped to deny its authority to assume
such policies as against the agent's claim for his compensation.

**Assumption of Agent's Charge: ULTRA VIRES.** The agreement by
3 which a life insurance association, assuming the policies of an-
other association, promises to pay the agent of the other asso-
ciation a commission for the renewal of policies so assumed
which was a fixed charge on such policies, is not ultra vires.

**Accounting: BURDEN OF PROOF.** In an action by an agent for an ac-
4 counting and to recover commissions on policies secured by him,
the defendant having possession of the books and records from
which the correct account can be determined is charged with
the burden of proof as to the amount due; and upon default
in its proof, cannot complain of a judgment for the highest
amount shown due by plaintiff's evidence.

*Appeal from Polk District Court.*—HON. C. A. BISHOP,
Judge.

TUESDAY, FEBRUARY 16, 1904.

ACTION in equity for an accounting and for recovery
upon a contract for commissions. Judgment for plaintiff,
and defendant appeals.—*Modified* and *affirmed.*

*Carr & Parker* for appellant.

*Spurrier & Mills* and *Read & Read* for appellee.

WEAVER, J.—On or about March 21, 1898, a life insur-
ance society known as the "Bankers' Guaranty Life Associa-
tion" was organized at Des Moines, Iowa.    Charter mem-
bers were admitted without an entrance or membership fee,
but members admitted after the organization was completed
were required to pay a membership fee of $10 each.    All
members were required, in addition to regular contributions
to the benefit fund, to pay $3 per year in quarterly install-
ments to an expense fund.    On the date above mentioned the
association, by its president, employed the plaintiff to can-
vass for memberships, and agreed that in consideration of
such services he should receive, among other things, $1 per
year on each $1,000 of insurance thus obtained by him, such
payments to continue as long as the policies remained in
force.    As to insurance issued to charter members obtained
through his agency, he was to receive $2 per year on
each $1,000 for a period of five years, and thereafter
at the general rate of $1 per $1,000.    It is understood,
however, that the association should not be liable for
the payment of these sums except as the same should be col-
lected from the policy holders.    The contract further pro-
vided for its termination upon certain contingencies,
but that such termination should not have the effect
to deprive plaintiff of his right to commissions upon the
renewals of the insurance procured by him during the
period of his agency.    By another clause it was agreed
that no transfer of management or change of name of the
association, or reinsurance by any other concern, should af-
fect plaintiff's right to receive the stipulated income from
the renewals of said policies.    Under this contract plaintiff
entered the service of the association, and continued therein
until June, 1899, when said association was absorbed by the
defendant as hereinafter mentioned.    As the result of ser-

vices of plaintiff and his subagents, a large amount of insurance was written by the association. Indeed, so far as the record shows, substantially all of the business done by the association was obtained through this agency. In June, 1898, the association amended its articles of incorporation, and assumed the name of "Union Life Association." In June, 1899, negotiations were opened between the Union Life Association and the defendant herein for a transfer of the assets and business of the former to the latter. This negotiation was conducted by these associations through their respective presidents, L. W. Laughlin and F. W. Cherry. At the outset of this movement plaintiff was called into consultation and told of the contemplated transfer, and had some conversation with Mr. Cherry about coming into the employ of the defendant in case the transfer was made. The fact that he had been the principal agent in working up the business, and the nature of his contract for compensation, was evidently fully understood by Mr. Cherry, and plaintiff was led to believe he would be continued in the employ of defendant on the same terms. On June 13, 1899, a written contract was made between the defendant association and Laughlin, in his individual capacity, by which defendant agreed to deposit $1,700 in the Des Moines National Bank, subject to the order of Laughlin, "When $700 of insurance with the other assets of the Union Life Association has been transferred over to the Farmers' Life Association as per agreement hereto attached." The agreement attached to said writing purports to be between the two associations, and their names are signed thereto by their respective presidents. It recites that, whereas the respective boards of directors of these associations have adopted resolutions providing for a transfer of the business of the Union Association to the Farmers' Association, it is therefore agreed that meetings of the members of each corporation shall be called for July 15, 1899, to ratify and consummate the deal; the intention, as expressed, being to transfer to the Farmers' Life Association "the membership of the Union Life Association now in force and good

standing, and to impose upon the Farmers' Life Association the obligations and duty of carrying out the obligations created by the certificates of membership,  *  *  *  or such of them as each member of the Union Life Association may elect to accept from the Farmers' Life Association." After some fashion the ratification or approval of the membership of the contracting associations were obtained to the proposed transfer, and on July 19, 1899, the assets of the Union Life Association, consisting principally of "one roll-top desk and one chair," were turned over to the defendant, whose president received the same, and at the same time receipted for certain papers, including the written contract with plaintiff upon which this action is founded. The method adopted by defendant for a transfer of the individual memberships to itself was to send out to each member of the Union Association a printed notice of its assumption of the contract, with a statement that such assumption would become of full force and effect upon receiving notice from the member of his acceptance, or upon receipt of payment of the first assessment or call made upon him by the defendant. Very soon after the transfer plaintiff sought to have his status with the defendant fixed by a written contract, but Mr. Cherry, the manager in charge, refused to do so, save on terms to which plaintiff would not agree; and upon demand by the latter for the share claimed by him in the quarterly renewal payments for July, 1899, Mr. Cherry, in a letter shown in evidence, repudiated all obligation in that behalf on part of the defendant, saying, "You certainly realize that you have no contract with the Farmers' Life Association, and never have had; and that we have never recognized the contract with the Union Life Association. I expected to credit you with a certain amount of business on which I would pay renewals if you contracted with us. If you do not see fit to contract with us I certainly shall not pay you anything." Upon this state of facts plaintiff claims to be entitled to recover from defendant, upon the quarterly or annual renewals of insur-

ance secured by his agency, to the same extent he would have been entitled to recover from the Union Life Association had the transfer not been made; and to that end he asks that defendant be required to make an accounting of such renewals received since said transfer. The defenses pleaded to this claim, and relied upon by appellant in argument, are indicated in the succeeding paragraphs of this opinion.

I. The point is made that the contract in suit is unreasonable and void, even as against the Union Life Association, because it operates "to tie up" the funds which may accrue

1. AGENTS contract: construction.

to the association in the future, and attempts to control the future governing boards and officers of the association in the exercise of the rightful powers and discretion vested in them. The objection is not tenable. Under this contract plaintiff was not employed for life or for any fixed period, thus leaving it clearly within the discretion of the association to discharge him after a reasonable trial of his services. The commission agreed to be paid is not a charge or incumbrance upon the business of the association generally, but upon so much only as plaintiff himself procured. In these respects the contract differs so entirely from the one in *Burkhead v. School District,* 107 Iowa, 29; *Carney v. Ins. Co.,* 162 N. Y. 453 (57 N. E. Rep. 78, 49 L. R. A. 471, 76 Am. St. Rep. 347), and *Caldwell v. Ins. Co.* 65 N. Y. Supp. 826, cited by appellant, that we think this phase of the argument requires no further discussion. It may be true that his claim of a continuing interest in the renewals was something of an incumbrance upon the future income of the association, but the same may be said of any debt or obligation payable in the future. No attempt is made to show that the compensation for plaintiff's services as provided by the contract is unreasonable or extravagant in amount, or that the contract was obtained by fraud or by collusion with the officers of the association. The association had the usual and necessary power exercised by insurance organizations generally to appoint agents and

to provide for their compensation, and if, instead of undertaking to pay a stated salary, it agreed to pay such an agent a specific commission upon or share of the expense fund collected from the policy holders secured through his agency, we see no reason for holding such an agreement either unreasonable or inequitable. We think it a matter of common observation that in organizations of this character, having no capital or visible assets beyond the traditional "office desk and chair," the promoters and agents are rarely, if ever, paid salaries, but receive compensation upon a commission basis of some kind. If the agent secures no business for the association he receives no pay, but if he does secure business, then the income received therefrom is charged with the agent's agreed commission or share; in other words, the business procured by him pays its own expenses. Nor is there anything essentially vicious or wrong in agreeing to pay the agent some reasonable compensation from renewals received upon the insurance negotiated by him. Such contracts, as is well known, have the sanction of long usage in the insurance world. They not only tend to stimulate the agent's activity in procuring the business originally, but prompt him to watchfulness and care to prevent lapses of the policies issued through his agency, and serve to promote the stability and permanency of the organization he represents. There is therefore no good reason shown for questioning the validity of the contract as between the Union Life Association and the plaintiff.

II. Appellant contends that under its articles of incorporation and by-laws it had no power to purchase the business or assume the liabilities of the Union Life Association, and that the agreement so to do, if one was 2. ASSUMPTION of business of another association: agents commission: estoppel. made, is *ultra vires* and void. In this connection appellant places much reliance upon *Twiss v. Guaranty,* 87 Iowa, 733, but the cases are not parallel in fact or in principle. In the *Twiss Case* a policy holder died while a member of the Guar-

anty Association, and the loss represented by his policy became a valid and existing debt of that organization. With that liability already existing, a contract was entered into by which the Southwestern Association agreed to perform all and singular the undertakings, agreements and covenants of the Guaranty Association, and to pay all outstanding claims for unpaid losses. Suit was brought on the policy, and payment thereof sought to be enforced against the Southwestern Association. We there held that the mortuary or benefit funds of the Southwestern Association were held in the nature of a trust for the benefit of its members, and the same could not be diverted to pay a loss which occurred in another association. It was further held that as the Guaranty Association was shown to be insolvent, and the Southwestern Association had not in fact received anything for its alleged assumption of liability, the latter was not estopped to rely upon the defense of *ultra vires.* If, in the case before us, plaintiff's claim was one which had accrued or become payable from the Union Life Association before the transfer of the business to the defendant, or if it was shown that defendant had received and retained nothing of value by reason of such transfer, or if it was sought to enforce payment of a debt of the Union Life Association from funds contributed by members of the defendant association and set apart to their use, then the precedent cited would perhaps be in point. No such circumstances are here shown. The transfer was apparently framed with express care to avoid the objection made in the *Twiss Case.* There was no assumption by the appellant of any existing indebtedness or unpaid losses. Its agreement was in effect that it would take over the business and assets of the association (not including any liability for existing debts or unpaid death claims), and, as to all members of the Union Association consenting thereto, it would treat their policies as its own contract. Whether that agreement would authorize an assessment upon the entire consolidated membership for the payment of a death loss

under one of the policies thus taken over is a question which does not here arise, and we need not consider it. Neither is it necessary to say that any assessment or charge could be made upon the consolidated membership to pay the expenses incurred under plaintiff's contract of agency. Each of the policies taken over by defendant was subject to a fixed charge of $3 per year per $1,000 of insurance, payable quarterly, for the maintenance of an expense or contingent fund; and upon each payment to that fund, upon insurance procured by plaintiff, he had a claim for the agreed share or commission. Defendant acted with full knowledge of plaintiff's contract, and, having received the transfer, proceeded to collect these quarterly renewals. Then, and not till then, did any indebtedness arise to plaintiff for which it could be held liable. It has received these moneys, not only with notice of the charge attaching thereto for the benefit of plaintiff, but with promise to pay the same, and it will not now be permitted to retain them and shield itself behind the plea of *ultra vires* against plaintiff's demand for an accounting. *Holmes Mfg. Co. v. Holmes Metal Co.,* 127 N. Y. 252 (27 N. E. Rep. 831, 24 Am. St. Rep. 448); *Rider L. R. Co. v. Roach,* 97 N. Y. 378; Wood's Field, Private Corporations, 355; 2 Herman, Estoppel, section 1179; *Bradley v. Ballard,* 55 Ill. 413 (8 Am. Rep. 656); *Thompson v. Lambert,* 44 Iowa, 239; *Church v. Johnson,* 93 Iowa, 544; *Field v. Building Ass'n,* 117 Iowa, 201.

We must not overlook the fact, already suggested, that to hold defendant liable for the payment of plaintiff's claim does not in reality add a single dollar to the burden of its original members. Defendant is required to account only for the renewal payments made to the expense fund by the membership taken over from the Union Association. If that is honestly done, the money contributed to the expense fund by the original membership of the defendant is left undiminished and undisturbed. To compel such an accounting encroaches upon no fund held in trust for the original members. Defendant having accepted the memberships trans-

ferred to it, and having collected these moneys thereon, cannot plead that it has received no valuable consideration for its undertaking; and, even if the agreement for the transfer was in excess of its corporate powers, defendant is not in position to rest upon the plea of *ultra vires*. Nor is the agreement to pay this sum a violation of section 1788 of the Code. That section, by its express terms, applies only to assessments made, and not to fixed charges or dues for contingent expenses. But should we apply that statute to the present case, plaintiff's claim is one of the expenses incident to the business, and its payment is not a diversion of the fund. It is essential to the success of life insurance that each member shall pay, in premiums, entrance fees, or dues, a sum which shall cover not only the cost of carrying the risk upon his life, but the expense incurred by the insurer in securing his membership. Upon the plan of business adopted by these associations, the latter item was evidently sought to be covered by the entrance fee required of each member (except charter members), and the quarterly contributions to the expense fund. In making plaintiff's claim a charge upon the expense fund, and especially in cases of charter members, from whom no other available fund is provided, the association was acting within the limits of its authority.

III. But is the agreement beyond the legitimate scope of the defendant's corporate power? While, as said in the *Twiss Case,* there is no authority by which one association can "buy members" from another, yet there is nothing in the law which forbids an insurance organization to pay or agree to pay a reasonable compensation to an agency which brings to it acceptable risks. If, in the present instance, plaintiff had procured this list of members for the defendant association direct, it is clear that its promise to pay a compensation for the service thus rendered would be within the scope of its powers, so long, at least, as the benefit funds set apart for death losses were not diverted from their proper purpose in violation of the funda-

3. ASSUMPTION of agents: charge: ultra vires.

mental laws and rules of the corporation. If, then, instead of bringing the members direct to defendant, he brings them to it through the medium of another association (and that is the net result of the transaction), is it any less legitimate for the defendant to agree to pay part of the commission he has thus earned? We think not. No precedent has been cited, nor have we been able to find any, which denies the existence of such authority—an authority without which the promotion of life insurance would be paralyzed. It is said, however, that the record discloses a payment by defendant of $1,700 to the president and $475 to the secretary of the Union Association, and that this must be considered as the compensation, if any, intended in the nature of commissions. Assuming that these payments were intended as such compensation, the business thus procured was known to be subject to a charge accruing to the plaintiff, and it must be assumed that, even as thus burdened, defendant believed it was worth the sum which it invested in its purchase. In our judgment the court below was right in holding the plaintiff entitled to recover.

IV. It is said that the judgment entered is excessive. This contention appears to be well founded. Th first petition in the case was filed December 21, 1899, and plaintiff's 4. ACCOUNTING: claim as therein stated was limited to his deburden of proof. mand for commissions upon the quarterly renewals for July and October of that year, estimated by him at a total sum of $300. On May 16, 1900, a supplementary petition was filed, making a further claim of $150 for each of the quarterly renewals for January and April, 1900, and increasing the total demand sued upon to $600. On December 4, 1901, by another supplementary petition, the claim was again increased to a total of $1,500, the commission alleged to be due upon each of the quarterly renewals being stated at "about $300," and in each instance the court was asked to require defendant to make an exhibit or showing of its receipts of renewals from the business secured by plain-

tiff. Upon the trial plaintiff was able to testify to the number and names of policy holders in good standing in the Union Association at the time the business was turned over to the defendant. He did not claim to know, nor did he offer any proof of, the number of policy holders or of the amount of the insurance which continued or became effective in the defendant association, nor of the amount of renewals collected thereon by defendant. The trial court evidently held, and correctly, we think, that, the defendant being under obligation to observe the terms of the agency contract, and having within its exclusive possession the books and records from which its correctness could be proven and the amount due plaintiff be definitely known, the burden was upon it to make a showing from which the court could determine the amount of the recovery. If there was default in this respect (and the plaintiff contends there was), defendant could not complain if the court adjudged it liable for the largest amount which the plaintiff's evidence tended to establish as his due. The judgment, which was for the full amount claimed, $1,500, would seem to indicate that such may have been the basis of the court's finding.

It is contended, however, that defendant did submit an accounting—a detailed list of all the members of the Union Association who continued membership in the defendant, with an itemized statement of the quarterly renewal collections made therefrom up to the date of trial. Whether this accounting was offered in evidence is disputed, and the matter has been made the subject of proceedings by defendant in the trial court for a correction of the record. The correction was ordered, making the record show that the evidence was in fact introduced, from which order plaintiff has appealed. Without discussing the respective claims upon this cross-appeal, we will say that we find no error in this order, and think the same must be affirmed. Treating this accounting as in evidence, the judgment must be materially reduced. It is true that the showing made in appellant's original ab-

stract and amended abstract is somewhat confused, and in some features' seemingly contradictory, yet, taking it as a whole, it affords a fairly substantial basis for estimating the amount of plaintiff's recovery. In respect to this feature of the record, it is appellee's contention that the case was tried below upon the concession that if entitled to recover at all he was entitled to recover judgment for the full amount of his claim. That this is a mistake seems to be shown by appellee's abstract. In a colloquy between court and counsel pending the introduction of testimony, the court said, in substance, "I understand that if, upon consideration of all these matters, I shall be of the opinion that the defendant is liable, then the basis of its liability shall be the members of the Union Life who went into the Farmers' Life"; and this statement seems to have been accepted by counsel on both sides as a correct definition of their position. We find no concession as to the actual number of policy-holders or amount of insurance transferred to defendant. Taking the evidence as a whole, it appears that the total amount of insurance originally procured through plaintiff's agency, and subsequently transferred to the defendant association, did not exceed $163,000, a part of which had lapsed prior to the trial in the district court. Without extending this opinion by setting out a formal itemized account, we have to say that, after careful computation upon the basis of the contract of agency, plaintiff was entitled to recover commissions upon renewals of this insurance for the period from June, 1899, to October, 1901, aggregating, with interest to the date of trial, the sum of $677.57.

We conclude, therefore, that the plaintiff's recovery must be reduced to the said sum of $677.57, as of the date of the judgment entry, and that, as thus modified, the judgment of the district court must be affirmed. The costs of this court are apportioned, and ordered taxed one-half to the appellant and one-half to the appellee.—Modified and Affirmed.