## KANSAS UNION LIFE INS. CO. v. BURMAN.

(Circuit Court of Appeals, Eighth Circuit. November 8, 1905.)

### No. 2,217.

**1. CONTRACTS—BREACH OF ONE OF TWO INTERDEPENDENT CONTRACTS.**

Where two contracts are made between the same parties on or about the same day, the later of which was demanded by the plaintiff as a condition for executing the first, so as to make the observance of both obligatory, and the plaintiff himself breaches the first, it places him in no position to maintain action against the other party for an alleged breach of the later signed contract.

**2. INSURANCE—CONTRACT WITH AGENT—BREACH BY PRINCIPAL—ESTOPPEL.**

It is a wholesome rule of law that where a party assigns a reason for his conduct and decision touching the matter involved in the controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and different consideration. Where an agent for an insurance company, under a salary contract and for certain commissions, sends in his resignation to the company, specifying the grounds thereof, *held* that, in a subsequent suit against the insurance company for breach of the contract of employment, the plaintiff is estopped from alleging other grounds as the cause of his resignation.

**3. MASTER AND SERVANT—DISCHARGED EMPLOYÉ—ACCOUNTING—SUIT FOR DAMAGES—BREACH OF CONTRACT.**

Where an employé sues the employer for damages for wrongfully terminating the contract of employment, he must render an accounting for salary and profits received in other employment covering the time in question.

[Ed. Note.—Mitigation of damages for wrongful discharge by failure of servant to seek or accept other employment, see note to Alaska Fish & Lumber Co. v. Chase, 64 C. C. A. 5.

For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 54–56.]

**4. INSURANCE—CONTRACT WITH AGENT—PERFORMANCE—DECREE OF COURT.**

A contract between two insurance companies was entered into, whereby the business and policies of one were taken over by the other, and the agent of the transferror company took service under the transferee company under an agreement with it to guaranty his commissions on premiums on renewal policies as paid to the company; but before any such premiums were collected, by a decree of court, at the suit of stockholders in the transferror company the transfer agreement was declared to be ultra vires, the statu quo before the transfer agreement re-established, the transferee enjoined from collecting such renewal premiums, and the agent was enjoined from paying the same, save to the transferror company. *Held*, that the vis major which prevents performance in such case is the interposition of the court, and that such decree rendered impossible of performance of said contract between the transferee company and the agent.

**5. SAME.**

The plaintiff, holding a contract of employment as agent of the Kansas Mutual Life Insurance Company for a fixed salary and commissions on premiums on renewal policies, after he had obtained policies sufficient to entitle him to such commissions, the said insurance company, by convention, transferred its business and policies to the Union Life Insurance Company. In consideration of plaintiff continuing in the service of the latter company as agent on an agreed salary and commissions on new business, the latter company guarantied the performance of the mutual company's contract with the plaintiff for commissions on renewal policies as paid. The said contract so guarantied provided that in case the employment should end for any cause, the company would pay his commis-

sions on renewed policies as the same were paid to the company. Before any such premiums were collected or paid to the company, by a decree of court the agreement between the two companies was declared void and the statu quo re-established. *Held,* that the plaintiff could not maintain action against the Union Life Insurance Company for the estimated value of such renewal policies on the ground that the defendant company had wrongfully rendered the contract impossible of performance.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Kansas.

The Kansas Mutual Life Insurance Company was a mutual life insurance company organized under the laws of the state of Kansas. On the 14th day of April, 1898, it entered into a contract with the defendant in error, Frank Burman, appointing him state manager for the state of Nebraska. His compensation consisted of certain commissions on the first five years' premiums on policies obtained by him, varying from 50 to 70 per cent., and renewal commissions on premiums paid subsequent to the first year's premium of 7½ per cent., "as paid to the company," to be paid so long as he should remain in the active employ of the company under the contract, and in the event of the termination of the contract from any cause after two years from its date the company was to continue to pay him, if living, or to his executors, administrators, or assigns, the renewal commissions "as they accrue and are paid, less any indebtedness, for as many years as the party of the second part shall be in the employ of said company, provided there should not be less than $500,000 of insurance in force on the books of the company at the time of such termination, written by Burman or his agents. In case of collection of renewals by the company, 2½ per cent. should be deducted to cover the cost of said collection."

There were certain supplementary contracts between the parties modifying the first contract, which are not material to the questions to be decided. The plaintiff in error was organized as an old-line life insurance company under the laws of the state of Kansas. On the 18th day of December, 1902, the Kansas Mutual Life Insurance Company (hereinafter for convenience called the "Mutual Company") and the said Kansas Union Life Insurance Company (hereinafter for convenience called the "Union Company") entered into an agreement whereby the Mutual Company in form transferred to the Union Company all its assets and business controlled or possessed by it, whereby the Union Company undertook to reinsure all of the risks of the Mutual Company. Upon the execution of this contract between the companies, of which the defendant in error was advised, under a parol agreement he took service under the plaintiff in error in continuation of the business in the state of Nebraska. On the 10th day of January, 1903, the said agreement and transfer between the two said companies was assailed by certain of the stockholders of the Mutual Company, by suit instituted in the United States Circuit Court for the District of Kansas, on the ground that the said contract and transfer were ultra vires. The two companies were made defendants in said suits. On the 5th day of February, 1903, on preliminary hearing, Judge Hook, the presiding judge, granted a temporary injunction, staying the further prosecution of said arrangement between the two companies, and appointed three trustees, with the powers of receivers, to take possession of all the property attempted to be transferred by said contract of December 18, 1902. With full knowledge of the pendency and object of said suit, the defendant in error entered into a written contract with the plaintiff in error, said Union Company, of date January 30, 1903, whereby the plaintiff in error agreed to continue the defendant in error as the state manager for Nebraska for one year, on a salary basis of $200 per month. In consideration of this special salary contract and the remuneration hereinafter named the said Frank Burman covenanted and agreed to devote his whole time, talents and energies in promoting the best interests of said company in every way, under direction and co-operation with its executive committee. The parol evidence

admitted by the court tended to show that the defendant in error was unwilling to enter into this salary contract unless the plaintiff in error would guaranty to him the commissions as provided under his contract with the Mutual Company; and that accordingly a written contract was entered into between them, of date January 31, 1903, which recited:

"That, whereas, on the 18th day of December, 1902, a contract in writing was entered into by and between the Kansas Union Life Insurance Company and the Kansas Mutual Life Insurance Company of Topeka, Kansas, wherein and whereby all of the outstanding risks of the Kansas Mutual Life Insurance Company were reinsured in the Kansas Union Life Insurance Company; and whereas, in said contract of reinsurance the said the Kansas Union Life Insurance Company guarantied to and did assume all of the outstanding liabilities of the Kansas Mutual Life Insurance Company of every kind, nature and description whatsoever. Now, therefore, in consideration of the payment of one dollar and other valuable consideration to the party of the first part in hand paid by the party of the second part hereto the receipt of which is hereby acknowledged, the party of the first part doth hereby guaranty unto said party of the second part to carry out all the terms and provisions of the certain contract made and entered into on the 14th day of April, in the year 1898, between the said the Kansas Mutual Life Insurance Company of Topeka, Kansas, party of the first part, and Frank Burman, of Omaha, Nebraska, party of the second part; and doth further guaranty to the said party of the second part to carry out all of the terms of the certain supplemental agreements made and entered into between the said the Kansas Mutual Life Insurance Company and the said Frank Burman at various times prior to this date; and in consideration of this guaranty the said party of the second part agrees on his part with the party of the first part hereto to carry out all of the terms of said last named contracts."

The salary contract above referred to was signed on behalf of the Union Company by J. P. Davis and W. M. Wellcome, executive committee; and the guaranty contract was signed on behalf of the company by J. P. Davis, president, and attested by John E. Moon, secretary. The validity of these contracts is denied by the plaintiff in error on the ground that under the by-laws of the association such contracts could only be executed by the executive committee, which at the time consisted of five members, the president, vice-president and secretary together with two other members of the board; and that the execution of these instruments was not authorized by the executive committee. The defendant in error on being advised of such action in the United States Circuit Court had some correspondence with the president of the Union Company respecting the matter; and on the 13th day of February, 1903, he sent in his resignation in the following letter:

"Omaha, Neb., Feb. 13, 1903.

"Mr. J. P. Davis, Pt., Topeka, Kansas—Dear Sir: In view of the decision of Judge Hook in the recent case testing the legality of the transfer of the Kansas Mutual into the Kansas Union and placing it in the hands of trustees, thereby making it impossible for me to be of any service to your company, I have decided to sever my connection with the Kansas Union Life Insurance Company, as you and the public generally are aware the complications that have arisen in this matter are such that a conscientious agent of the Kansas Union or the Kansas Mutual would be doing both himself and the company he undertook to represent an injustice in attempting to write insurance at the present time. And it will be at least some time before this embarrassment can be overcome. I have worked faithfully for your company and had the brightest prospects for the present year's work, and would have had the same prospects had not the Kansas Union interfered with the Kansas Mutual by undertaking to absorb it in the manner that has now been decided by the court to be contrary to law. My contract with the Kansas Mutual expired January 31st last, in so far only as the salary and expense provision applies, but is still in full force and effect as to the renewal commissions, which for several years would have earned me a considerable sum of money had not this illegal transfer been made. It is evident that this union of the two

companies has very materially damaged me with reference to my Kansas Mutual contract, and as the Kansas Mutual Life Insurance Company is directly responsible for this loss to me, I will, as soon as I can estimate my actual damages, present a claim against your company for such damages. And while I will make this claim against your company, I do not in any manner waive any rights I have against the Kansas Mutual Life Insurance Company under all my contracts with that company. I therefore by these presents tender my resignation as state manager for Nebraska, to the Kansas Union Life Insurance Company to take effect March 1, 1903, but desire it to be distinctly understood by the company that, by so doing, I do not waive any rights I have under my contract with your company, whereby your company has guaranteed my renewal commissions due and to become due under my contracts with the Kansas Mutual Life Insurance Company. I regret very much that I have been forced to take this step, but I have no apologies to make, in view of the fact that I am in no sense responsible for the disruption of the company.                        Yours very truly,
    "[Signed]                        Frank Burman, State Mgr."

On the 18th day of February, 1903, this resignation was formally accepted by letter from the president of the company. The evidence tended to show that between the date of the said contracts of January 30th and 31st and the formal resignation of the defendant in error, he had received proposals from the Fidelity Mutual Life Insurance Company to enter its service in the same field in the state of Nebraska, which proposals he held in abeyance. On the next day after his resignation, to wit, the 14th day of February, 1903, he entered into a contract with the said Fidelity Company as superintendent of the state of Nebraska, at a salary of $200 per month, with a bonus of 6 per cent. of the gross premiums received from its business in excess of the premiums received in the state of Nebraska for the previous year. He drew his salary from the plaintiff in error to the 1st of March, 1903, and his occupation with the Fidelity Company began on the date of his contract, so that from the 14th day of February to the 1st day of March he drew pay from the two companies, which fact was not then known to the plaintiff in error. By the said interlocutory order of the court of February 5, 1903, inter alia, it was ordered that: "All agents, attorneys and subordinates whatsoever of the Kansas Union Life Insurance Company, having in their possession any money or property of whatsoever nature or description, belonging to or derived from the Kansas Mutual Life Insurance Company, either directly or indirectly, be and they are hereby ordered and directed, when so demanded, to account for and turn over the same to said trustees above appointed."

In conformity therewith the plaintiff in error, its servants and employés, turned over to the trustees the property and business received under the contract of December 18, 1902. Said interlocutory order, declaring the arrangement between the Mutual and the Union Companies void as ultra vires, was made final on the 23d day of March, 1903. Subsequently, on the 27th day of June, 1903, all the property and business attempted to be so conveyed by the Mutual Company to the Union Company was, under order of the court, transferred and sold by the trustees or receivers to the Illinois Life Insurance Company (the latter company, by an enabling statute of the state of Kansas being authorized to so acquire said property). Both in the decree nullifying the transfer arrangement between the Mutual and the Union Companies and in the order of sale to the Illinois Life Insurance Company, the court imposed the obligation upon the trustees of the Mutual Company and the transferee, the Illinois Life Insurance Company, to assume and pay all outstanding obligations of the Mutual Company. On the 10th day of March, 1903, the defendant in error brought this action, by which he sought to recover the present value of the renewal premiums (commissions) under the terms of the contract with the Mutual Company, and the loss and damages resulting from the failure to fulfill the contract for continuous employment for one year; treating the contracts between the defendant in error and the plaintiff in error as having been broken by the latter, so as to entitle him to recover the full present value of all commissions on renewal premiums. The court, by

its instruction, limited the recovery to the present value of commissions on renewal premiums; and under its charge the jury so found and returned a verdict for $4,750, the present value of the renewal commissions. The trial court proceeded upon the theory that it was not necessary for the defendant in error to prove the amount of the renewal premiums in fact paid to the company as provided under the contract of April 14, 1898; but that he might recover the present value thereof, past and prospective. To reverse the judgment, entered on this verdict, the Union Company prosecutes this writ of error.

C. J. Evans and L. A. Stebbins (W. W. Phelps, on the brief), for plaintiff in error.

Clifford Histed and Frank Lincoln McCoy (Robert H. Olmsted, W. H. Rossington, and Charles Blood Smith, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and PHILIPS and CARLAND, District Judges.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

This action is predicated of two written contracts of January 30, and 31, 1903. We are unable to perceive what advantage can be claimed by the defendant in error in having it conceded that the two contracts of January 30th and 31st "were made, executed and delivered at the same time and as part of one transaction." If they are to be treated as interdependent, so as to be an inseparable legal unit, the action should fail when no recovery was or could be had for a breach of the salary contract. Indeed, if, as his counsel insists, the inducement for the guaranty of the contract between the parties was the acceptance of service as agent under the plaintiff in error, and the defendant in error, of his own motion, resigned that agency, it would follow that the consideration between the parties for the two contracts should be held to have failed, and therefore the plaintiff in error would be absolved from liability on both. As the judgment was predicated alone of the contract of January 31st, it must stand or fall as the right of recovery thereon shall be decided.

The first contention is that the plaintiff in error broke the salary contract of January 30th by refusing to go on with its execution, independent of the interference of the court in annulling the contract of December 18, 1902, between the two companies; and second, by reason of its failure to renew the license to do business in the state of Nebraska. A brief review of the correspondence between the parties between January 31st and February 13th, the date of defendant in error's resignation, and the letter of resignation, will demonstrate that the resignation was voluntary, and that the contention now made respecting the obligation of the plaintiff in error to retain the defendant in error under the salary contract and the failure to renew the license, is a mere afterthought. In the letter of February 5th, advising the defendant in error of the decision of Judge Hook and the purpose of the court to perpetuate the business of the Mutual Company, Mr. Davis, president of the Union Company, after saying that "the decision was a great disappointment," said:

"In the meantime, the officers of the company are instructed to continue the business, but pay out no money until the trustees are qualified to take possession, which we assume will be within the next few days. The trustees are instructed to continue the present officers and clerks, with a view of making the Kansas Mutual a going concern, doing a general business, until such time as the trustees and court agree upon a plan of reorganization. * * * It is our very earnest wish and desire that the Kansas Mutual be perpetuated. Whether there will be any amalgamation with the Kansas Union is a doubtful question. It is a question of expediency whether to undertake to build up a new and independent company from the start. From the fact that the court found against the company it seems to us plain that it would be quite difficult for the agents to write business for either company. On receipt of this letter kindly give me your views in regard to the advisability of undertaking to perpetuate the Kansas Union."

The response made to this letter by Mr. Burman was a demand to return to him a check for the amount of premiums paid on his own policy and that of his wife for the month of January; thus contributing to discredit the business and bring about lapses on policies. In this letter he made complaint of the failure to pay his salary. On the same day Mr. Davis wrote him informing him that under the order of the court the officers, clerks, agents, and collectors, should collect premiums under the supervision of the trustees appointed by the court, and remit them to the office as usual, and generally carry on the business of the Mutual Company as theretofore; that these officers were directed to pay out no money at the present time, and for that reason they were restrained from paying the February salary and March rent, until the trustees qualified and took charge of the business, promising to call their attention to this matter. In another letter of the same date Mr. Davis advised Mr. Burman of a conference had that morning with a number of the agents and the attorney, and that it was decided under the order of court that the officers, clerks, agents, etc., were expected to render their services to the Kansas Mutual Life, and therefore he advised that they proceed with the solicitation of applications for the Mutual Company.

On the 7th of February Mr. Burman wrote Mr. Davis in answer to the letter of the 6th, making inquiry as to whether the Kansas Mutual had authority to do business in Nebraska, as its certificate expired on the 1st of February, in which letter he said:

"It is my opinion that the Kansas Mutual Life will never succeed in reorganization, although I earnestly hope that they may do so. This reinsuring in the Kansas Union and then the reorganization of the Kansas Mutual has done irreparable harm. * * * Will you kindly advise me where I stand? I hold a contract with the Kansas Union Life Insurance Company, and also a guaranty with them that my renewal commission contract with the Kansas Mutual will be taken care of. And in the absence of a contract with the Kansas Mutual, I shall hold the Kansas Union for my salary and expenses. I shall be pleased to receive full instructions in regard to this matter. The impression of our policy holders and the public in general is that the company is insolvent and in the hands of receivers. * * * If this is not a fact, equal prominence should be given to repudiate that statement, and it also seems to me that every policy holder should receive an explanation as to the company's status and future and that cannot be done any too quickly."

This is the only reference made by Mr. Burman to the expiration of the license to do business in the state of Nebraska. On the same

date Mr. Davis wrote Mr. Burman, in explanation of why his salary had not been paid, that it was customary to remit the salary on receipt of itemized expense bill, which was not received until the 5th instant, and that he had no thought that the funds would be tied up as they were by Judge Hook's decision; otherwise a check would have been forwarded without waiting for the expense account. The letter inclosed an extract from the interlocutory order of the court holding the Kansas Union harmless from loss on account of the reinsurance contract, and to protect it against legal claims or demands against the Mutual Company prior to December 18, 1902, further stating:

"The Kansas Union has no other thought or intention but of being true to you and every other agent and employé, and have arranged for the Kansas Mutual to protect the Kansas Union along every line. * * * In the meantime, please use your influence in keeping the policy holders in line and also the agents in your employ."

On February 10th Mr. Davis, replying to a letter of Mr. Burman of the 7th instant, said:

"You ask the question where do you stand, holding a contract with the Kansas Union and also a guaranty that renewal commission under your Kansas Mutual contract will be taken care of. The Kansas Union expects to take care of your contract fairly and honorably, and from inclosures you will notice that the court provides that the Kansas Mutual shall protect and hold the Kansas Union harmless on account of any agent's contracts taken over from the Kansas Mutual Life Insurance Company. * * * Please be patient and kind about the matter, and you will receive a check for salary and all other expenses at an early date. You ask how about the policies issued by the Kansas Union. Of course, the Kansas Union will take care of and protect the interest of its policy holders."

On February 11th the trustees wrote to Mr. Burman, advising him that the business of the Mutual Life would be continued on the lines as near as possible conducted prior to the 18th of December, 1902; that he was authorized and directed to solicit applications for insurance in the Mutual Company on the same conditions as set forth in his agency contract; and directing him to encourage the policy holders to pay renewal premiums when due. The only response made to all this was the letter of resignation of February 13th, which shows on its face that the sole ground of resignation was his conclusion that the decision of Judge Hook, annulling the contract between the two companies, made "it impossible for me to be of any service to your company," and in which he stated that:

"The complications that have arisen in this matter are such that a conscientious agent of the Kansas Union or the Kansas Mutual would be doing both himself and the company he undertook to represent an injustice in attempting to write insurance at the present time. And it will be at least some time before this embarrassment can be overcome. * * * It is evident that this union of the companies has very materially damaged me with reference to my Kansas Mutual contract, and, as the Kansas Mutual Life Insurance Company is directly responsible for this loss to me, I will, as soon as I can estimate my actual damages, present a claim against your company for such damages. And while I will make this claim against your company, I do not in any manner waive any rights I have against the Kansas Mutual Life Insurance Company under all my contracts with that company. I therefore by these presents tender my resignation as state manager for Nebraska to the Kansas Union Life Insurance Company to take effect March 1, 1903,

but desire it to be distinctly understood by the company that by so doing I do not waive any rights I have under my contract with your company, whereby your company has guaranteed my renewal commissions due and to become due me under my contracts with the Kansas Mutual Life Insurance Company."

The letter of resignation shows on its face that this astute insurance agent was stating his case with a view to litigation with the plaintiff in error, and with ingenious particularity he specified the reasons that influenced his surrender of the agency. It was not upon the ground that the Union Company was unwilling to proceed to carry out the salary contract, or on the ground of a failure to renew the license. It is a wholesome rule of law, instinct with fair play, expressed by Mr. Justice Swayne, in Railway Company v. McCarthy, 96 U. S. (6 Otto) 267, 24 L. Ed. 693:

"Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law."

This principle has been applied in the following instances: Davis v. Wakelee, 156 U. S. 690, 15 Sup. Ct. 555, 39 L. Ed. 578, where a bankrupt obtained his discharge, claiming that the judgment against him was not affected by it, it was held he could not, in a subsequent action on the judgment, deny its validity. In Davis, etc., Company v. Dix (C. C.) 64 Fed. 411, where it was held that the purchasers of a creamery repudiating the contract on the ground of fraudulent representations, could not thereafter set up an interpolation in the contract. In Harriman v. Meyer, 45 Ark. 40, where it was held that the defense that a tender was not made in ready money was not admissible where the prior objection was to inadequacy of price. In Wallace v. Minneapolis, etc., Elevator Company, 37 Minn. 465, 35 N. W. 269, where it was held that a bailee refusing to deliver wheat because claimed by another, could not afterwards refuse on the ground that the charges were not paid. In Harris v. Chipman, 9 Utah 105, 33 Pac. 243, where it was held that a plaintiff rejecting title for want of administrator's bond, could not be heard to object afterwards that letters of administration were not under seal. In Ballou v. Sherwood, 32 Neb. 689, 49 N. W. 796, where it was held that title objected to because of pending litigation, the purchaser could not afterwards object for want of seal on the deed. In Frenzer v. Dufrene, 58 Neb. 436, 78 N. W. 720, where it was held that where a party alleged his wife's recalcitrance as a reason for not executing a contract, he could not afterwards be heard to allege other reasons.

This rule should have especial application to this case for the palpable reason that had the defendant in error assigned as a reason for resigning his agency the neglect to renew the license, he would have afforded the company an opportunity to remove the objection. By not assigning the delay or omission as a reason for his refusal to continue his agency, and making no claim either in his letter of resignation or in fact in the petition that the plaintiff in error was unwilling to go ahead with the salary contract, he, in effect, said such ground is not relied on. The truth is that the most persuasive

influence for his hasty action in resigning his agency, within 13 days after the making of the contract between him and the plaintiff in error, was the one he carefully concealed in his letter of resignation, and that was that before he acted as the agent of the Mutual Insurance Company he had acted as the agent of the Fidelity Insurance Company, and that during the time between January 31st and February 13th he was conducting a correspondence with the president of the Fidelity Insurance Company, looking to the taking of service under it in the Nebraska field and to carry over to it, not only his own influence, but the services of his entire employés in that field, and he hastened into that new arrangement immediately after sending in his letter of resignation, without waiting even for the formal acceptance of said letter. And the evidence shows that in one of his letters to the president of the Fidelity Insurance Company he requested that the contract between them be concealed. And he drew salaries from both of these companies up to the 1st day of March, 1903.

By his own statement, in the letter of resignation, he recognized that the only obligation of the Union Company for his commissions on premiums was under the contract of assumption for the liability of the Mutual Company; and he only made claim for his salary up to the 1st of March. The whole gravamen of the petition as a basis for the claim for damages under the salary contract is the alleged failure of the plaintiff in error to renew its license in the state of Nebraska. Moreover, on the trial, on ruling on the demurrer to the evidence and in its charge, the court expressly ruled that no damages by way of profits on anticipated business which the defendant in error might do for the plaintiff in error within the year, were recoverable; but in the submission to the jury limited the inquiry to supposable commissions on renewal premiums. The defendant in error sued out no writ of error on this ruling, and he is, therefore, in no position to complain here thereof. He has had his day in court on that issue, and that controversy has passed in rem judicatum. What possible basis did or could Burman furnish for estimating such profits? During the year he was doing business in the same field under a salary contract of $200 per month and traveling expenses, with a bonus or sum equal to 6 per cent. of the gross premiums received on business from the date of the contract with the Fidelity Company, which took effect February 14, 1903, in excess of the premium receipts from said state for the previous year. This contract, according to the proofs, he deemed more advantageous to himself than his salary contract with the plaintiff in error. As he could not have served both masters in the same field during the same year, to furnish any possible basis for estimating profits in this action an accounting of his salary and commissions earned under his contract with the Fidelity Insurance Company would have to be taken to show his loss, if any. His claimed damages in this respect, therefore, were entirely speculative, if not imaginary.

Treating the two contracts of January 30th and 31st as divisible, as the defendant in error must do to sustain his judgment, he must maintain the position, not only that the plaintiff in error, on the 13th day of February, 1903, had broken the contract of January 31st, but had

so far repudiated it as to entitle him to then demand of it his whole
expectancy on the policy contract obtained for the Mutual Company,
both of earned commissions and renewal commissions. As the con-
tract by its very terms was one of guaranty of the contract between
the defendant in error and the Mutual Company in respect of such
commissions, we are remitted to that to ascertain what in fact and law
the plaintiff in error guarantied. The ninth paragraph of said con-
tract expressly declares:

"That no commissions shall be due or payable to said party of the second
part upon any policy, except upon the actual payment in cash to said com-
pany of the premium stipulated in that policy for the terms for which the
commission is claimed."

And respecting renewal commissions it declares that:

"The renewal commissions under this contract on all forms of policies shall
be 7½ per cent. of the annual premium, as paid to the company."

As the guaranty is no broader than the thing guarantied, the only
undertaking by the plaintiff in error in this respect was, first, to pay
to the defendant in error commissions upon the policies obtained by
him "upon the actual payment in cash to said company of the
premiums," and, second, the renewal commissions as the premiums
should be "paid to the company." The petition neither avers, nor
did the defendant in error make proof, that any such payments had
been made after the execution of the contract in question or any prior
thereto unaccounted for. And if any such premium had been col-
lected or received by the plaintiff in error, unaccounted for, it was
by the decree of the court required to be turned over to the trustees
appointed by the court. To escape from this obvious purport of the
contract of guaranty, counsel for the defendant in error was driven to
the position of seeking to maintain the right to recover the entire
amount of prospective premiums on the theory that by its wrong the
plaintiff in error had broken the contract so as to render it impossible
of performance. This contention took form and was made the basis
of recovery in the following portion of the court's charge to the jury:

"However, if you find from a preponderance of all the evidence in this
case, that the defendant company and the property it received from the Kan-
sas Mutual Life Insurance Company were, by the decision of this court,
placed in the hands of trustees appointed by this court and afterwards turned
over to the Illinois Life Insurance Company, under order of the court, and
that the appointment of said trustees and the decision of this court rendered
impossible the fulfillment of the contract, and that this was occasioned by
the fault of the defendant company in entering into its contract with the
Kansas Mutual Life Insurance Company, then and in that event the breach
of the contract between plaintiff and defendant was in law occasioned by the
defendant."

From which it is made clear that the learned trial judge was not will-
ing to say that if all the property and benefits which the plaintiff in error
received from the Mutual Company were by the decision and order
of the court taken away from it and placed in the hands of trustees
of the court, and under its order turned over to the Illinois Life In-
surance Company, whereby the contract was rendered impossible of ful-
fillment, the defendant in error was entitled to recover as for a breach

of the contract; but in its ultimate analysis the right of recovery was made to depend upon the further fact that this action of the court was occasioned by the fault of the plaintiff in error in entering into the contract with the Mutual Life Insurance Company. There being no dispute as to the facts about the decree and orders of the court, and no dispute about the plaintiff in error having entered into the contract with the Kansas Mutual Life Insurance Company, it was simply a conclusion of law for the court whether or not the acts constituted a breach of contract; and yet, by the charge of the court, this question was turned over to the jury without instructive direction, in some indefinable way, to determine for themselves whether the plaintiff in error was at fault in entering into the contract with the Kansas Mutual Company, and whether that, as a matter of law, made it liable to this action.

An actionable breach of contract, in its very nature, must be supervenient. It must arise after the making of the contract, from some affirmative act in disregard of its mandate. The act of entering into the contract with the Kansas Mutual Life Insurance Company occurred 40 days prior to the contract in question with the defendant in error. The existence of the contract between the two companies was fully known to the defendant in error when he entered into the contract with the plaintiff in error on January 31, 1903. More than that, he then knew that the validity of that contract was being tested in court; and it was as much within the contemplation of the defendant in error as in that of the plaintiff in error that the possibility of carrying out the contract of guaranty depended upon the result of that suit. When the defendant in error entered into the contract with the Mutual Company no contractual relations existed between it and the defendant in error, and it owed him no duty in that regard. In so far as he was concerned, the plaintiff in error could enter into any arrangement with the Mutual Company to take over its business and reinsure its outstanding risks, without incurring any liability to any agent of the Mutual Company, except its liability to account in equity to such agent for any fund transferred to it by the Mutual Insurance Company, or thereafter received by it under the contract of transfer, when such fund might be chargeable in its hands with some lien, express or implied, in favor of such agent. No adjudicated case has ever gone further in this direction.

The case of Schrimplin v. Farmers' Life Association, 98 N. W. 613, 123 Iowa, 102, is an apt illustration. In that case the Bankers' Guaranty Life Association made a contract with an agent which inured to the benefit of the complainant, Schrimplin, by which the agent became entitled to a stipulated commission on premiums obtained by him, and on renewals thereof for a designated period. The contract contained the express stipulation that no transfer of management or change of name of the association or reinsurance by any other concern, should affect the plaintiff's right to receive the stipulated income from the renewals of said policies. Under this contract the agent effected a large amount of insurance, when the said association, by convention between it and the Union Life Association, transferred

its assets and business to the latter company. At the time of this transfer a right to renewal commissions, etc., had accrued to the agent. The written contract between the old company and the agent was passed over and delivered to the Union Life Association. Negotiations between the latter company and the agent for the latter's entering into its service failed of consummation. Thereafter the agent filed his bill in equity against the Union Company, on the theory that the complainant was entitled to recover from the defendant upon the quarterly or annual renewals of insurance secured by him to the same extent he would have been entitled to recover from his principal had the transfer not been made; and to that end he prayed that the defendant be required to make an accounting of all such renewals as it had received since said transfer. It was held that as the defendant company took with full knowledge of the plaintiff's contract with the old company, which created an equitable lien on the funds collected to the extent of the amount of commissions, it took cum onere. But it was distinctly held that the defendant was liable only to account for commissions on premiums actually collected by it. The court said:

"Then, and not till then, did any indebtedness arise to plaintiff for which it could be held liable. It has received these moneys not only with notice of the charge attaching thereto for the benefit of plaintiff, but with promise to pay the same, and it will not now be permitted to retain them and shield itself behind the plea of ultra vires against the plaintiff's demand for an accounting. * * * We must not overlook the fact, already suggested, that to hold defendant liable for the payment of plaintiff's claim does not in reality add a single dollar to the burden of its original members. Defendant is required to account only for the renewal payments made to the expense fund by the membership taken over from the Union Association."

Commenting upon the case of Twiss v. Guaranty, 87 Iowa, 733, 55 N. W. 8, 43 Am. St. Rep. 418, the court said:

"If, in the case before us, plaintiff's claim was one which had accrued or become payable from the Union Life Association before the transfer of the business to the defendant, or if it was shown that defendant had received and retained nothing of value by reason of such transfer, * * * then the precedent cited would perhaps be in point."

What difference can it make that the action at bar is based upon an express contract between the parties rather than on one which the law implies? The same obligation and the same consequences arise and flow from each. The express undertaking was to account to the defendant in error for his commissions as the premiums should be paid to the company, and not otherwise. On the authority of this Iowa Case, invoked by counsel for defendant in error, it mattered not if the contract between the two companies was ultra vires, the purchasing company was estopped from interposing such defense, on the ground that having knowingly, by virtue of the transfer, received and retained the fund impressed with a trust in favor of the complainant, it was unconscionable to withhold it from the cestui que trust. But in the case at bar, not only has the plaintiff in error not received any fund to which the claim of the defendant in error attaches in its hands, but the very compact it made, by which alone it could ever collect or receive a cent of premiums, was nullified by the decree of court, and it

was enjoined from ever receiving such premiums, and the defendant in error was prohibited from paying to it any such premiums, out of which his commission was to come. The decree re-established the statu quo of the Mutual Insurance Company, and there is no claim made that it was insolvent. There is no charge made in the petition of any fraud or collusion on the part of the plaintiff in error by which that decree was brought about. On the contrary, the record shows that the plaintiff in error resisted the suit, and up to the very time of Judge Hook's ruling, on the 5th day of February, 1903, that the transaction was ultra vires, it stoutly asserted its validity. And when the judicial announcement came it tried to persuade the defendant in error to continue his services, as he of all men occupied such position towards the business as would save it from injury by reason of the interposition of the court. It is true that when the case came on for final decree the plaintiff in error consented thereto, with the same grace that a man submits to execution when resistance can no longer avail. Instead of the defendant in error loyally standing to his post of duty to protect the policies of the Mutual Insurance Company against lapses, he left it to sink or swim, while in his letter of resignation he declared that he proposed to hold it equally with the plaintiff in error to the payment of the unearned renewal commissions.

As already suggested, the defendant in error knew when he entered into the contract with the plaintiff in error that the validity of the transfer from the Mutual Company was being tested in court; and that the ability of the plaintiff in error to perform the contract by accounting to him for commissions on premiums paid depended upon the result of that suit. And one remarkable feature of the court's ruling on the demurrer to the evidence was in the following paragraph:

"I have refused to allow evidence here as to damages for anticipated profits on this contract, because the plaintiff in this case knew, or by the exercise of any ordinary care might have known, that the Kansas Union had placed itself in such a position under the law that it could not comply, and I have relieved the case of that element of damages."

If the plaintiff was disentitled to recover damages for anticipated profits because he knew that the Kansas Union had placed itself in such position under the law that it could not comply, for the same reason, and by the same logic, he was not entitled to recover any other damages resulting from the alleged breach of the contract.

In his letter of resignation the defendant in error said:

"In view of the decision of Judge Hook in the recent case testing the legality of the transfer of the Kansas Mutual into the Kansas Union and placing it in the hands of trustees, thereby making it impossible for me to be of any service to your company, I have decided to sever my connection with the Kansas Union Life Insurance Company."

If the decree absolved him from his contractual obligations, by making it impossible for him to be of any service to the company, by the same token, mutatis mutandis, it should follow that it operated to acquit the company from further performance.

In People v. Globe Mutual Life Insurance Company, 91 N. Y. 174, it was held that where a life insurance company had entered into a contract with an agent for a specified term, at a stipulated salary, etc.,

and before any breach of the contract by it, it was restrained from the further prosecution of its business under its franchise by order of the court, and a receiver was appointed, the agent had no valid claim upon the fund in the hands of the receiver for damages resulting from an alleged breach of the contract by causing a discontinuance of his employment, in the absence of evidence that it was some fault of the company which had induced the superintendent of the insurance department to make the certificate upon which the Attorney General instituted the suit; that the action of the court was not the action of the corporation, whatever may have been the cause prompting the the act. The court distinguished such action of law, in a judicial proceeding, from that class of cases where the company stopped payment before any intervention of law, and by a voluntary refusal of performance breached the contract; and also from that class of cases which affect property rights and survive the death of the parties, in which instance performance can be made by the assignees or successors, where there was no incapacity affecting both parties' alike.

In principle there can be no distinction between an injunction granted on the interposition of the state, in the exercise of the soveriegn right of visitation, and one granted by the court at the suit of a stockholder on the ground that the transaction of the two corporations is in contravention of the charter granted by the sovereign. The decree of the court rendered it illegal for the plaintiff in error to collect or receive a dollar of premiums on the policies issued by the Mutual Company; and it prevented the agent from paying over a dollar to the plaintiff in error of any such premiums. And as there was no evidence that the plaintiff in error either induced or connived at the action taken by the stockholders of the Mutual Company, the case seems to us to come within the ruling in People v. Globe Mutual Insurance Company, supra, the reasoning of which commends itself to our approval. This case is followed and approved by Judge Simonton in Malcomson v. Wappoo Mills et al. (C. C.) 88 Fed. 680, holding that damages are not recoverable against a corporation for its failure to perform a contract for the sale and delivery of merchandise where performance was prevented solely by the action of a court in appointing a receiver for the corporation, and enjoining all others from interfering with its business or property. The vis major, which prevents performance in such cases, is the interposition of the court.

The situation is little different, in the concrete, from that where, on account of the nature of the contract, it is evident that the parties dealt on the assumption of the continued existence of the thing to which it relates, the subsequent destruction of which, in law, will excuse performance. The substantive thing contracted about by the parties here was the collection of renewal premiums on the policies theretofore issued by the Mutual Company, on which depended the right of the defendant in error to commissions. And when the court, without default on the part of either party, and against the resistance of the plaintiff in error, impounded the subject-matter—took it into custodia legis—and prohibited the plaintiff in error from collecting or receiving any such premiums, and required the agent to attorn to the trustees appointed by the court, it in effect put an end to the

existence of the thing—the subject of the contract—in so far as the parties to that contract were concerned. While the act of the Mutual Company in undertaking to transfer its business to another corporation was revocable at the suit of a stockholder, as between it and its agent there was nothing in the contract of employment which would prevent it, in the economy and conduct of its own business affairs, from wholly abandoning the field in Nebraska or from going entirely out of business, or changing its business from that of a mutual company to that of a level premium company. In re English & Scottish Marine Insurance Company, 5 L. R. Chan. Appeal, 737; Pellet v. Mfrs. & Mer. Insurance Company, 104 Fed. 502, 43 C. C. A. 669; Stier v. Imperial Life Insurance Company (C. C.) 58 Fed. 843.

Aside from the liability of the Mutual Company to the defendant in error for commissions on premiums collected, the only limitations or conditions imposed by the contract between him and the Mutual Company are found in the 12th paragraph, which declares that:

"In the event of the termination of this contract from any cause after two years from date hereof, the company will continue to pay to said Frank Burman, if living, or to his executors, administrators or assigns, the renewal commissions under this contract as they accrue and are paid, less any indebtedness, for as many years as the party of the second part shall have been in the employ of said company under this contract; provided, there shall not be less than $500,000 of insurance in force upon the books of the company at the time of such termination, written by said party of the second part and his agents; provided, further, that if at any time the renewal premiums or any portion of them are collected by or at the expense of said company, or in the event of the termination of this contract from any cause whatsoever, there shall be deducted from the renewal commissions due said party of the second part, 2½ per cent. of the annual premium as collected, to cover cost of said collection."

So if the attempted transfer by the Mutual Company to the Union Company warranted the agent, Burman, in treating his agency for it at an end, the situation came clearly within the purview of said paragraph 12, as a termination of the contract from any cause after two years from its date (the contract at that time having been in force more than two years), whereby he would, as against it, be entitled to be paid by it "the renewal commissions as they accrue and are paid." If such renewal premiums are paid to the Mutual Company or to its transferee, with notice, or under a guaranty or assumption, the agent would be entitled to his commissions or renewals as they accrue and are paid and not otherwise. He cannot be placed in a better position by a termination of his contract from any given cause than the contract expressly stipulates. Where the parties by contract have expressly provided for the liability of one of the parties by reason of its termination, it is not for the court to substitute a different and additional liability.

Other errors complained of in the progress of the trial, and the charge of the court to the jury, need not be considered. As the case stood at the conclusion of the evidence, the court should have directed a verdict for the defendant below. The judgment of the Circuit Court is, therefore, reversed, and the cause is remanded with direction to grant a new trial and for further proceedings herein in conformity with this opinion.